CAMP PHOSPHATE COMPANY, A CORPORATION, *Appellant,* v. CHARLES E. ALLEN, TAX COLLECTOR OF CITRUS COUNTY, FLORIDA, *Appellee.*

Opinion filed April 2, 1919.

1. The provisions of Section 1, Article IX of the State Constitution, that "The Legislature shall provide for a uniform and equal rate of taxation, and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal, excepting such property as may be exempted by law for municipal, educational, literary, scientific, religious or charitable purposes," are mandatory.

2. The purpose of the Statute in requiring property to be assessed at its full cash value is to secure uniformity and equality of burden upon all property in the State as contemplated by the Constitution; and where all taxable property has been assessed on a basis of fifty per cent of its true cash value the purpose of the constitutional provision has

not been defeated, and such infraction of the Statute affords no ground for a court of equity to declare the assessment void.

3. Where there is an intentional, arbitrary and systematic undervaluation by tax officials of some of the taxable property in the same class with other property, it contravenes the constitutional rights of one whose property is intentionally and arbitrarily over-valued.

4. More errors of judgment by tax officials in making assessments of property for taxation will not support a claim of unjust discrimination. There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity.

5. The good faith of tax officers and the validity of their actions are presumed; and when assailed the burden of proof is upon the complaining party.

6. The general presumption arising in favor of tax officials, supplemented by their sworn testimony to the effect that they endeavored to follow the law and assess all property upon an equal and uniform basis and that if any property was otherwise assessed it was unintentional and not pursuant to any design, do not necessarily impair the probative effect of official admissions and direct and circumstantial evidence from unimpeached sources that a large portion of the lands of a county belonging to one class of owners was intentionally and systematically assessed far below the fixed basis of valuation, whereas lands owned by another class of owners were assessed far above such basis of valuation.

7. Where tax officials intentionally make unjust valuations for taxation with an unlawful purpose in view, the assessment is illegal and void.

8. A mere omission to assess taxable property in consequence of a *bona fide* belief that the omitted property is exempt from taxation, or where unjust valuations for taxation re-

sult from inadvertence or negligence without any intent to impose additional or unequal burdens upon the taxpayers, the assessment may not be void.

9.  When a rule or system of valuation for purposes of taxation is adopted by those whose duty it is to make the assessment, which is intended to operate unequally, in violation of the fundamental principles of the constitution, equity may properly interfere to restrain the operation of the unconstitutional exercise of power.

10. Valuations for taxation must have a just relation to the real and known value of the property assessed, and not to some unknown and speculative value, and there must be no substantial inequality in valuations in the various kinds and items of property that is subject to tax; and when the tax officials have not sufficient knowledge or information of the real value of the mineral deposit upon which to base a fair and equitable valuation, they should assess the land upon some basis of known value obtainable as required by law.

11. The Board of County Commissioners in this State is an essential part of the taxing system; their duties as such are prescribed by law, and when the members of that board sitting as a board of equalizers deliberately, intentionally and arbitrarily sustain an assessment which they know to be unjust, unequal and discriminating, they perpetrate a fraud upon the injured taxpayers to whom a court of equity will grant relief.

12. When the essential requirements of law are not observed in making valuations of property for assessment and the valuations as made are shown by admissions or proofs to be clearly excessive, unjust and unequal, appropriate relief may be had in equity, even though the proceedings authorized by law for seeking relief from administrative officers were not utilized when the case made shows a flagrant violation of or omission to follow the mandatory requirements of the law in valuing property for taxation.

An Appeal from the Circuit Court for Citrus County; W. S. Bullock, Judge.

Decree reversed.

*Anderson & Anderson,* for Appellants;

*George W. Scofield, Glenn Terrell* and *T. F. West,* Attorney General, for Appellee.

JONES, Circuit Judge.—Camp Phosphate Company is a Florida corporation owning about 18,000 acres of land in Citrus county and carries on the busines sof mining for phosphate on a portion of its lands. The appellant filed its bill in the Circuit Court of Citrus County against Charles E. Allen as Tax Collector for said county, praying for an injunction to restrain the said Tax Collector from selling its property to enforce the collection of taxes due and unpaid on same for the year 1915.

The grounds set forth in the bill for relief are in substance as follows: That the assessment against appellant's real property for the year 1915 amounted to the sum of $4187.79; that it had paid its personal tax and was willing and ready and offered to pay all taxes legally and justly assessed against its real property, but had made no actual tender of money in payment of said real property tax to the defendant because the defendant as tax collector and no other official had any legal right to accept any sum less than the actual amount shown on the assessment roll, and avers that appellant refused to pay the said sum so assessed against it because said assessment was unjutly, illegally and fraudulently made; that the full amount due by appellant for taxes on its

real property was the sum of $1575.52, based upon the valuation made by appellant in its sworn return of its property for assessment.

That appellant prior to April, 1915, made a sworn return of all its property, both real and personal, with the valuation thereof to the assessor, but that the assessor ignored such return made by appellant, and arbitrarily and without inquiry and investigation, intentionally and deliberately, for the purpose of discriminating against appellant and requiring it to pay an unjust and disproportionate share of the public tax, assessed the lands of appellant at a valuation of nearly three times its true cash value; that said assessment is grossly excessive, arbitrary and unjust and deprives appellant of its legal and constitutional rights, in that while appellant's property is assessed at a valuation exceeding its true cash value, practically all the real an dpersonal property of local resident tax payers in said county has been uniformly assessed at a valuation far below its true cash value, to-wit: at from fifteen to thirty per cent of its cash value, and that said discrimination against appellant was not committed by the tax officials of the county through any honest mistake or error of judgment, but was done for the purpose of illegally relieving local resident tax payers from bearing their just burden and placing upon appellant and others similarly situated an unjust part of the taxes of said county; that it has been the systematic rule and practice of the assessor and county commissioners of said county to unjustly and excessively value for taxation all property owned by corporations and non-resident tax payers owning large bodies of land and to greatly undervalue for taxation real and personal property of local and resident tax pay-

ers. That these officials have followed a fixed rule of valuing any and all lands owned by appellant at from three to six times as much as similar lands of local and resident tax payers. It is alleged that several other phosphate companies, whose names are given, owning lands in the county have been grossly discriminated against by over valuation of their lands.

Many tracts of land from forty to two hundred or more acres owned by appellant and situated in different portions of the county are described and the assessed valuation of each is stated and compared with lands of alleged similar character and situated in same section or contiguous thereto owned by local tax payers showing in each instance that the valuation placed on appellant's land was greater than that of the resident owner's land. That the settled course and policy of the assessor, approved by the county commissioners, is to value all improved farming lands at approximately three dollars per acre, regardless of improvements or other elements affecting value, and all lands of corporations, particularly phosphate mining companies, if situated in what is known as the "phosphate belt," have been assessed at an arbitrary value without regard as to whether it contained phosphate value for mining purposes. It is averred that representatives of the appellant and other land-owning corporations appeared before the board of county commissioners sitting as a board of equalizers and protested against the alleged over valuation of their property without avail. That said commissioners had an understanding between themselves whereby it was agreed they would not consider any testimony offered by the corporations in their effort to secure a reduction of values, but that they would sustain the asseessor in all

his valuations upon the property of appellant and others similarly situated. That although the statute required all property to be assessed at a true cash valuation the assessor ignored the statute and pretended that he had assessed all property upon a basis of fifty per cent of its value and that, therefore, the entire assessment was illegal and void.

Answer was filed admitting that in compliance with instructions from the State Tax Commission all real and personal property in Citrus County was assessed on the approximate basis of fifty per cent of its true cash value. It is denied that property of farmers and other resident and individual tax payers was assessed at less than fifty per cent of its value and that of appellant and other corporations on a valuation exceeding its true cash value; all the material averments of the bill are denied and it is alleged that all assessments and valuations are uniform, fair, just and equal, and that there was no discrimination.

A demurrer to the bill is incorporated in the answer.

The Chancellor referred the case to a Special Master in Chancery to take the testimony and report to the court the testimony together with his findings as to whether the restraining order should be granted. The cause not having been disposed of and the appellant's property having been advertised for sale by the Tax Collector, on application of appellant and recommendation by the Master a temporary restraining order was granted staying the sale of the property pending the further order of the court. Afterwards the Master reported his findings and recommended that the demurrer be overruled and that the restraining order be vacated. Excep-

tions to the Master's report were filed by appellant and after hearing arguments for ten days the Chancellor overruled the exceptions, confirmed the Master's report, vacated the order granting the restraining order, denied temporary injunction and upon motion of appellant showing that injunction was only relief sought, the bill was dismissed. Complainant appealed.

It is alleged in the bill and admitted in the answer that there was a total failure to comply with the statute requiring lands to be assessed at their full cash value and for this reaosn alone appellant contends that the entire assessment is void. In considering this question it will be necessary to consider the statute referred to in connection wtih the constitutional provision in pursuance of which it was enacted. Sec. 1, Art. IX, of the Constitution, provides that, "The Legislature shall provide for a uniform and equal rate of taxation, and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal, excepting such property as may be exempted by law for municipal, educational, literary, scientific, religious or charitable purposes." Section 23, Chapter 5596, Acts of 1907, provides that "The County Assessor of Taxes shall ascertain by personal inspection, when not already sufficiently acquainted therewith, the value of lands and assess them at their full cash value."

It will be obesrved that for the purpose of raising the necessary revenue to defray the expenses of the State government the constitution requires the Legislature to do two things: first, to provide for a uniform and equal rate of taxation, and, secondly, to prescribe such regulations as shall secure a just valuation of all property subject to taxation. It is obvious that the purpose of these

two provisions is to adjust the burden of taxation so that every taxpayer may be required to contribute no more and no less than his share of the taxes in proportion to the value of his property.

There is no averment in the bill that the rate of taxation was not equal and uniform, but it is alleged that the assessment is illegal and void because the assessed valuation of property was not at its full cash value as required by statute. The purpose of the statute in requiring property to be assessed at its full cash value is to secure uniformity and equality of burden upon all property in the State, and if all the taxable property of Citrus County was assessed on a basis of fifty per cent of its cash value the purpose of the constitutional provision has not been defeated, nor has the appellant been injured. Among others a similar question was passed upon by the Supreme Court of the United States in the case of Green v. Louisville & Interurban R. Co., 244 U. S. 499, 61 L. Ed. 1280, —Sup. Ct. Rep. —, when the court said: "It is equally plain that it makes no difference what basis of valuation—that is what per centage of full value—may be adopted, *provided it be applied to all alike.*" The adoption of full value has no different effect in distributing the burden than would be gained by adopting seventy-five per cent or fifty per cent or even ten per cent as the basis, so long as either was applied uniformly. The only difference would be, that, supposing the requirements of the treasury remained constant, the rate of taxation would have to be increased as the per centage of valuation was reduced. Therefore, the principal, if not the sole reason, for adopting "full cash value" as the standard for valuations is as a convenient means to an end, the end being equal taxation. But if

the standard be systematically departed from with respect to certain classes of property, while applied as to other property, it does not serve, but frustrates the very object it was designed to accomplish. It follows that the duty to assess at full value cannot be supreme in all cases, but must yield when necessary to avoid defeating its own purpose.

A substantially identical question was presented to the Circuit Court of Appeals for the Sixth Circuit in Taylor v. Louisville and Nashville R. R. Co., 31 C. C. A. 537, 60 U. S. App. 166, 88 Fed. Rep. 350, where the constitution of Tennessee declared that all property should be taxed according to its value, to be ascertained as the legislature should direct, "so that taxes shall be equal and uniform throughout the State," and the statute required that the real value of the property be adopted, and where railroad property and some other kinds were valued by one set of officials and property in general by another, without provision for equalization as between two classes. The court, by Circuit Judge Taft, said (P. 364) :    The sole and manifest purpose of the constitution was to secure uniformity and equality of burden upon all the property in the State.  As a means of doing so (conceding that defendant's construction is the correct one) it provided that the assessment should be according to its value.  It emphasized the object of the section by expressly providing that no species of property should be taxed higher than any other species.  We have before us a case in which the complaining taxpayer, and other taxpayers owning the same species of property, are taxed at a higher rate than the owners of other species of property.  This does not come about by legislative discrimination, but by the intentional and systematic disregard of

the law by those charged with the duty of assessing all other species of property than that owned by complainant and its fellows of the same class.

The question presented is, then, whether, when the sole object of an article of the constitution is being flagrantly defeated, to the gross pecuniary injury of a class of litigants, and one of them appeals to a court of equity for relief, it must be withheld because the only mode of granting it will involve an apparent departure from the method marked out by the constitution and the law for attaining its sole object. We say "apparent" departure from the constitutional method because that instrument contemplated a system in which all property should be assessed at its real value.

The court is placed in a dilemma, from which it can only escape by taking that path which, while it involves a nominal departure from the letter of the law, does injury to no one, and secures the uniformity of tax burden which was the sole end of the constitution. To hold otherwise is to make the restrictions of the cosntitution instruments for defeating the very purpose they were intended to subserve. "It is to stick in the bark and to be blind to the substance of things. It is to sacrifice justice to an incident." There are courts which hold that where it is required by constitutional provisions or legislative act that property shall be assessed at its "full cash value" or words of similar import, that such provision is mandatory and when systematically and persistently violated the assessment will be held to be illegal, but as it is a matter of common knowledge that the several assessors of this State have never assessed the property in their several counties at its full cash value, but have invariably adopted a percentage of the real value as a basis for as-

sessment, we hold that if such assessment be uniform and equal such infraction of the statute does not afford grounds for a court of equity to declare such assessment void.

The next and most serious objection to the assessment is embraced in the several averments alleging discrimination. Taken collectively, they mean in substance that the Assessor intentionally and systematically undervalued for assessment the property of local and resident taxpayers for the purpose of relieving them of a portion of their just and proportionate share of taxes, and intentionally and systematically overvalued the property of appellant and others similarly situated for the purpose of imposing upon them an unjust and disproportionate share of the burden; also that the Board of County Commissioners confirmed said assessments and by agreement between the members composing the board gave no consideration to testimony and arguments of appellant and other corporations in seeking to have reduced the excessive assessments, but failed and refused to make any reduction.

It must be regarded as settled that intentional, systematic undervaluation by tax officials of other taxable property in the same class contravenes the constitutional right of one whose property is overvalued. Sunday Lake Iron Co. v. Township of Wakefield, 247 U. S. 350, 62 L. Ed. 1154, — Sup. Ct. Rep. —; Raymond v. Chicago Union Traction Co., 207 U. S. 20, text 35, 37, 52 L. Ed. 78, text 87, 28 Sup. Ct. Rep. 7, 12 Ann. Cas. 757. On the other hand, it is held that mere errors of judgment by officials will not support a claim of discrimination. There must be something more—something which in effect amounts to an intentional violation of the essen-

tial principle of practical uniformity. The good faith of such officers and the validity of their actions are presumed, when assailed, the burden of proof is upon the complaining party. Sunday Lake Iron Co. v. Township of Wakefield, *supra;* Head Money Cases (Edye v. Robertson), 112 U. S. 580, 28 L. Ed. 798, 5 Sup. Ct. Rep. 247; Maish v. Territory of Arizona, 164 U. S. 599, text 611, 41 L. Ed. 567, text 571, 17 Sup. Ct. Rep. 193; Adams Express Co. v. Ohio State Auditor, 165 U. S. 194, text 229, 41 L. Ed. 683, text 698, 17 Sup. Ct. Rep. 105; German-American Lumber Co. v. Barbee, 59 Fla. 493, 52 South. Rep. 292.

However, the general presumption arising in favor of tax officials supplemented by their sworn testimony to the effect that they endeavor to follow the law and assess all property upon an equal and uniform basis and that if any property was otherwise assessed it was unintentional and not pursuant to any design, do not necessarily impair the probative effect of official admissions and direct and circumstantial evidence from unimpeached sources that a large portion of the lands of a county belonging to a certain class of owners was intentionally and systematically assessed far below the fixed basis of valuation, whereas lands owned by another class of owners were assessed far above such basis of valuation. Louisville & N. R. Co. v. Green, 244 U. S. 522, 61 L. Ed. 1291, — Sup. Ct. Rep. —.

This case and that of Joseph Dixon Crucible Co. against the same defendant, instituted in the same court on same date, involve similar questions, except the latter involves the assessment of both real and personal property. By agreement of counsel testimony taken in both cases may be used in either when applicable. Numerous

witnesses were examined and a large amount of testimony adduced. Much of it has but a remote bearing upon the issues. Testimony covering hundreds of pages of the record is irreconcilably conflicting. Much of it is so vague and indefinite that it proves nothing, so conclusively as that the witnesses knew little or nothing about which they testified, therefore, there will be no detailed discussion of this mass of testimony, because there are sufficient uncontradicted or well established facts, which will be specifically referred to in order to elucidate the questions at issue, upon which to base this opinion.

It appears that for the purpose of assessment the lands of Citrus County were classified as orange groves, farms, cut-over lands, timber lands, phosphate land, phosphate mines and land in towns or villages. It is established there is a variety of soils grading from sandy unfertile lands, worth, unimproved, not more than one dollar to two dollars per acre, to the more productive lands valued, unimproved, as high as $25.00 per acre, dependent upon the character of soil, location and other elements of value; that there are farms distributed throughout the county, some on the poor and some on the better grade of land; that the appellant owns, according to the tax assessor's testimony, about 12,000 acres of land from which all the timber has been removed, commonly known as "cut over" land, distributed about over the county; that notwithstanding these admitted conditions the assessor for the year 1915 and for years previous, adopted a system whereby he placed a certain flat sum per acre on all orange, groves; a certain flat sum per acre on all farms, and followed the same method in assessing other classes of property without regard to the real and known value of the property assessed, as will be shown by refer-

ence, as briefly as possible with clearness, to the uncontradicted testimony. First, with reference to orange groves. The assessor himself testified that he at first estimated the value of the bearing orange groves at $400.00 per acre, but following the instructions of the county commissioners he assessed all bearing orange groves at a flat sum of $100.00 per acre, allowing fifty bearing trees to the acre—*i. e.,* if one acre contained fifty bearing trees it would be assessed at $100.00, if one and a half or two acres contained only fifty bearing trees it would be assessed at $100.00; and other lands connected with the grove at $5.00 per acre; that improvements such as fences, dwellings, barns, packing houses and other structures were not considered or valued in making the assessment. There is testimony tending to prove that these bearing orange groves, excluding the value of improvements, are reasonably worth from $300.00 to $600.00 per acre, and with the improvements, they are worth a great deal more, the value depending upon the age and condition of the trees, the quality and location of the land.

Section 1 of Chapter 5596, Acts of 1907, provides "that all real and personal property in this State—not hereby expressly exempted—shall be subject to taxation in the manner provided by law." Section 2, same act, provides that "real property for the purpose of taxation shall be construed to include lands and all buildings, fixtures and other improvements thereon."

The assessor admits that he assessed all the improved farms at a valuation approximately of $3.00 per acre and the cut-over lands of appellant and others at the same valuation; he admits that he added nothing to the value of farms for any improvements on them and does not

leave us to conjecture as to the motive which prompted him to thus violate the plain letter of the statute, but seeks to defend his unlawful method by extraordinary and ontradictory explanations; he says the farmers were not prosperous, they were leaving the farms and going to town; that the character of the improvements were poor and in many instances dilapidated, and for the purpose of encouraging the agricultural industry, and to induce people to come into the county, he placed no value upon any improvements on farm land. Thereby admitting his purpose, deliberately and systematically pursued, to relieve the resident farmers and owners of orange groves of a considerable portion of the taxes for which they were legally liable, the inevitable effect of which, he must have known, would be to cast an unequal and unjust burden upon other taxpayers. To justify this method, he said that he placed no value upon the dwellings and outhouses of turpentine operators and phosphate miners, *but did value all improvements on town lots,* also swears that in his opinion the clearing of land for a farm, the enclosing of it with fences, the cultivation of it, the construction of a dwelling, barn and other structures upon it add nothing to the value of the land and that for this reason he assessed the bare, unenclosed, unoccupied, unimproved cut-over lands when of like fertility at the same valuation as improved farms.

There is evidence that a majority of the farms are unproductive, with old, dilapidated improvements of little value, whereas a considerable number of farmers own more fertile farms, well equipped with improvements, aggregating in value many thousands of dollars, but it is shown by the testimony of the assessor himself that he made no difference in his valuations between a farm

highly improved, enclosed with a substantial wire fence, with a commodious and comfortable dwelling, good barn and other improvements and those of the poorer class. The obvious result is a gross pecuniary discrimination, not only against appellant and those similarly situated by the omission from the tax rolls of all these valuable taxable improvements, but also against the poor farmer who is required to pay practically the same amount of taxes on his farm as the more fortunate farmer on a like number of acres.

This court said in the case of Tampa v. Kaunitz, 39 Fla. 683, 23 South. Rep. 416: "We think tax officials, like all others, are required to exercise good faith in performing their official duties. They should not use their official discretion as a cover for fraudulent conduct in unequally and inequitably adjusting the burdens of taxation. For it is a salutary principle of law, which runs through all its branches, that fraud vitiates and annuls everything which it touches. If, therefore, tax officials intentionally commit an illegal act with a fraudulent purpose in view, as where taxable property is intentionally omitted for an improper purpose, we have no doubt that the entire assessment is illegal and void. If, however, the omission to assess taxable property arises in consequence of a bona fide belief on the part of the tax officers that the omitted property is exempt from taxation, or results from inadvertence or negligence without any intent on their part to impose additional or unequal burdens upon the taxpayers, the assessment will not be held to be void."

In the case of Cummings v. Merchants National Bank, 101 U. S. 153, text 164, 25 L. Ed. 903, the court said that "when a rule or system of valuation for purposes of tax-

ation is adopted by those whose duty it is to make the assessment, which is intended to operate unequally, in violation of the fundamental principles of the constitution, and when this principle is applied not solely to one individual, but to a large class of individuals or corporations, equity may properly interfere to restrain the operation of the unconstitutional exercise of power."

One other objection to the assessment is that the settled course and policy of the Tax Assessor, approved by the County Commissioners, is to value all improved farm lands at a fixed sum, approximately three dollars per acre, regardless of improvements and other elements of value, while on the other hand any lands of a corporation, particularly of a phosphate mining corporation, situated in what is known as the "Phosphate Belt," has been assessed by mere guesswork, the values being excessive and arbitrarily fixed without regard to whether any mineral valuable for use or for mining purposes is in the land or not and that such values are from three to five times as much as the value placed upon similar lands of resident owners.

The proof shows that phosphate rock is found under the surface of the ground, at some places only a few feet, and at others many feet; that frequently there are surface indications of the rock beneath; that it is found in deposits or pockets varying in size from small deposits of no value for mining purposes and which add no appreciable value to the land, to where it is found in deposits of sufficient area to be valuable as a mining proposition. The testimony of witnesses experienced in phosphate mining on both sides shows that a deposit to be of value for mining should contain a certain quantity of phosphate bearing rock; some of the witnesses place the mini-

mum quantity at 10,000 tons, and others at 20,000 to 30,000 tons for dry mining, and at 50,000 to 75,000 for dredge mining, and all agree that it must be of a certain grade to be ascertained by chemical analysis; that the means pursued to secure this information is to dig pits or bore holes until the rock is reached and then drill into the rock to ascertain its thickness; that the expense of thus prospecting is from $75.00 to $100.00 per acre; that it is impossible to know the quantity of phosphate rock, if any at all, or its quality, until the land has been prospected, and if the rock is found in sufficient quantity, then analyzed; that the minimum expense of constructing a plant to mine a deposit is from $8,000.00 to $10,000.00; that a great deal of the land in the county has small deposits of phosphate rock insufficient in quantity to justify the erection of a plant, and when thus contained adds no practical value to the land because of the great expense of providing a plant to operate the mine.

The uncontradicted evidence shows that many unprospected tracts of land owned by the appellant and other phosphate companies were assessed as phosphate land upon a valuation of $15.00 per acre, whereas the lands adjoining owned by residents were assessed at $3.00 per acre. The assessor admits that he adopted the "blanket system" in assessing lands which he believed contained phosphate; he testifies that if some one told him, or if he conjectured, that a tract of land contained a deposit of 2,000 or 2,500 tons he would classify the tract as phosphate land, but does not explain how he determines the existence of even that quantity; he testifies that he would assess the whole tract, be it forty or two hundred and eighty acres, as phosphate land, because he could not tell which acre or which forty acres contained the de-

posit.    The owners could not furnish this information
because they themselves did not know, it not having been
prospected.    The assessor admits that he placed a valu-
ation of only $3.00 per acre on the land of individual
owners adjoining the land of the phosphate companies
upon which he placed a valuation of $15.00 per acre, be-
cause he saw no indications of phosphate on the individ-
ual's land, yet, he says that he assessed large tracts of
land, property of appellant and other phosphate com-
panies as phosphate land because he suspected that per-
haps only one acre of the tract contained small deposits
of 2,000 or 2,500 tons.    Now, such a system as that is
wrong; it is contrary to equity and good conscience; it
is the means of intolerable oppression and injustice.    If
an assessor does not know that land contains a sufficient
quantity of phosphate rock to render it valuable for min-
ing purposes it should not be assessed as land of that
character; if he cannot locate the land which contains a
deposit of mineral rock he is not justified in assessing
two or three hundred acres of non-mineral land, as min-
eral land, in order to catch, as it were, in a drag net one
little pocket of phosphate.

Valuations for taxation must have a just relation to
the real and known value of the property assessed, and
not to some unknown and speculative value, and there
must be no substantial inequality in valuations in the
various kinds and items of property that is subject to tax.
There is no law requiring the assessor to prospect land
to ascertain if it contains valuable mineral deposits,
neither is there any law compelling the owner of land to
expend $75.00 or $100.00 an acre prospecting his land
for the information of a Tax Assessor.    If the assessor
had exercised a small degree of interest for the welfare

of the corporations, as was manifested for the farmers and orange growers, he evidently would not have found it necessary to assess large tracts of land known by him to be non-mineral at an excessive, fictitious valuation, in order to assess a deposit which by some unknown means he estimated to contain 2,000 tons when, it seems, it should be a matter of common knowledge throughout the county where phosphate mining has been carried on for many years, during which time he has resided there, that a deposit of less than 10,000 or 15,000 tons is of no value for mining purposes and adds no value to the land.

When the assessor has not sufficient knowledge or information of the real value of a mineral deposit upon which to base a fair and equitable valuation, he should assess the land upon some basis of known value obtainable as required by law.

We will consider only one other question raised by the pleadings. It is charged that the land of appellant and other land-owning corporations were intentionally, systematically and arbitrarily grossly over-valued, whereas, the lands of resident owners were greatly under-valued; that representatives of the corporations appeared before the Board of County Commissioners sitting as a board of equalizers and made complaint; submitted testimony and asked for a reduction of the alleged excessive valuations, but that the members of the board arbitrarily refused to consider their complaints and declined to make a reduction except in one or two instances of minor importance. The uncontradicted testimony discloses that representatives of the corporations appeared before the commissioners sitting as a board of equalizers at their July meeting, in 1915, and entered complaints against the excessive valuations of this property, a few items of which

will be specifically referred to; that they introduced
sworn testimony, produced their books, offered affida-
vits as to values, and proposed to pay the expense for an
investigation by any impartial man to be selected by the
Board. The Board without hearing any testimony in op-
position to that offered by the complainants, except some
affidavits of doubtful relevancy concerning the value of
the Joseph Dixon Crucible Co.'s property and the state-
ment of the assessor, refused to make any reductions, ex-
cept in one or two instances of small importance. It will
be borne in mind that the assessor claimed all assess-
ments were on a fifty per cent basis of actual values. It
appears that he assessed land of appellant in Sections
12-17-18, known as the Anderson mine, at $22,000, where-
as testimony for appellant tends to prove that the full
cash value is $12,800 and was returned for assessment at
$6400. Eighty acres as Barr mine returned at $800 be-
cause land practically worked out and plant gone to de-
cay, was assessed at $7,500. Eighty acres known as the
Ellison plant returned at $120 because entirely worked
out six or eight years ago and offered for sale at $3.00
per acre, assessed at $1200.00. Eighty acres known as
Citrus plant, diplapidated, out of use and offered for sale
at $1000.00, assessed at $5000.00. Plant known as Todd
plant, assessed at $13,000.00, when appellants swear
that they will sell both Citrus and Todd plants for said
amount. Phosphate Development Company complained
of the assessment of 120 acres in Section 28-20-20 at
$35.00 per acre because unminable, timber all removed
and abandoned eight years ago. Mutual Mining Co. com-
plained of assessment of 160 acres upon a valuation of
$19,800.00 and swears the actual cash value of the prop-
erty is from $2.50 to $3.00 per acre.

These few instances out of a great many will suffice to show the wide difference in valuations placed on the property by owners who testify they are familiar with the character and condition of the lands, and the assessor who testifies that he placed valuations on the property in many cases from what someone told him. Under these conditions the board made no reductions, except those referred to, although Mr. Williams, the chairman, testified that the board did not go into any details at the hearing and made very little investigation; that he was not satisfied then and is not satisfied yet that the board gave proper consideration to the complaints; that he believes the phosphate lands are assessed too high in comparison with other lands. Mr. Turner, another commissioner, testifies that there was no testimony heard in support of valuations fixed by the assessor and does not deny that he made a motion to sustain assessor's valuations. Mr. Rooks, a commissioner, testified there was some talk among the members of the board at the July meeting that they would refuse all applications for reductions and sustain the assessor in his valuations.

Mr. Davis, a commissioner, testified that the "blanket system" adopted by the assessor was wrong, but that the assessor was paid to fix the value of property and that he would sustain his valuations.

The law does not contemplate that the assessor is infallible, nor that his valuations shall be conclusive, but presumes that he will err, and provides the means for correcting his errors and equalizing his values by statute which requires the commissioners to give notice by publication or posting of the time when the board will be in session to hear complaints and receive testimony as to values of any property as fixed by the assessor and after

hearing testimony to raise or lower such values that the assessment may be equal and uniform. The Board of County Commissioners in this State is an essential part of the taxing system, their duties as such are prescribed by law and when the members of that board sitting as a board of equalizers deliberately, intentionally and arbitrarily sustain an assessment, which they know is unjust, unequal and discriminating, they perpetuate a fraud upon the injured taxpayers. Here the commissioners instructed the assessor to assess all bearing orange groves without regard to real value at only $100.00 per acre, leaving unassessed all improvements; they must have known that all farm improvements for the entire county were omitted from the tax rolls; they knew that all farm lands were assessed under a "blanket system" below their value; they heard complaints of excessive valuations from the corporations; they made no serious investigation as to values; admit the complaining parties were not given the consideration to which they were legally entitled; admit the lands of the corporations were assessed too high, and yet do not attempt to equalize the assessment.

It is said in the case of Graham v. City of West Tampa, 71 Fla. 605, 71 South. Rep. 926: "When the essential requirements of law are not observed in making valuations of property for assessment and the valuations as made are shown by admissions or proofs to be clearly excessive, unjust and unequal, appropriate relief may be had in equity, even though the proceedings authorized by law for seeking relief from administrative officers were not utilized when the case made shown flagrant violation of or omission to follow the mandatory requirements of the law in valuing property for taxation."

There is a great deal of testimony tending to prove the excessive valuation of property owned by the corporations, tract by tract, and to prove the under valuation of property, piece by piece, of resident taxpayers, but we have refrained from quoting or referring to all this testimony and have deemed it necessary to throw light on the questions involved to refer only to admissions and practically uncontradicted testimony from which we think it has been clearly established that the system of assessment adopted and systematically and intentionally pursued by the assessor and approved by the Board of County Commissioners was unjust, arbitrary and discriminatory and in contravention of the cardinal principles of equality and uniformity in taxation, required by the constitution and laws of this State.

It is, therefore, ordered that the decree of the lower court be and the same is hereby reversed for further proceedings in accordance with this opinion.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND ELLIS, J. J., concur.

WEST, J., disqualified.