HARJIM, Inc., et al. v. OWENS et al.
No. 982–M.

District Court, S. D. Florida.
Aug. 12, 1931.

Quincey & Rice, A. S. Bussey, and James R. Roads, all of West Palm Beach, Fla., for plaintiffs.

D. L. Southard, of West Palm Beach, Fla., Cary D. Landis, Atty. Gen., of Fla., and H. E. Carter, Asst. Atty. Gen., of Fla., for defendants.

RITTER, District Judge.

The plaintiffs are the owners of real and personal property in Palm Beach county who present their bill for an injunction and other relief against the publication of notice and sale of their property for nonpayment of taxes assessed thereon for the years 1927, 1928, 1929, and 1930. It is alleged in the bill that the defendant tax assessor, with the knowledge, consent, and acquiescence of the defendant county commissioners, deliberately, willfully, intentionally, arbitrarily, and fraudulently valued the property of the plaintiffs for taxation purposes for the said years at a higher percentage of values than on other property of similar character; that the values fixed by the assessor were not based upon any percentage of the actual cash value of the property, and that the tax assessor intentionally, deliberately, willfully, knowingly, arbitrarily, systematically, and fraudulently refused and neglected to assess a large amount of personal property which should have been assessed under the laws of the state; that the taxes of said county are not equal and uniform, and the said tax assessment roll is illegal and void, and the plaintiffs have been denied the equal protection of the law as guaranteed by the State and Federal Constitutions.

The defendants have answered, admitting a large part of the allegations of the bill, but denying the vital question as to the willful, deliberate, and fraudulent conduct of the assessor, as alleged, asserting the validity of the assessment, and that whatever errors or omissions may be found are not due to any such deliberate, intentional, and fraudulent conduct of the tax assessor, but are due to errors of judgment and inability to ascertain the omitted taxable property.

Under the allegations of fraud and intentional conduct of the tax assessor, this court has jurisdiction of the cause, and has heard the testimony and the arguments of counsel, and examined the briefs submitted.

This case is one which stands at the outset with a presumption in favor of the performance by the officers of their duty, as required by law. The burden of proof is upon the plaintiffs assailing the good faith of the tax assessor and the validity of his action. The tax assessor, in valuation of property, has a wide discretion. In the absence of proof of fraud, illegal acts, or abuse of discretion, courts will not control his valuations or omissions or property for tax assessment. There must be such illegal, intentional, arbitrary, systematic discrimination, and willful conduct as amounts to fraud in the making up the tax assessment roll before the court will exercise its power of interference. State v. Beardsley, 77 Fla. 803, 82 So. 794, 800; City of Tampa v. Palmer, 89 Fla. 514, 105 So. 115; Wade v. Murrhee, 75 Fla. 494, 78 So. 536; Graham v. City of West Tampa, 71 Fla. 605, 71 So. 926; Camp Phosphate Co. v. Allen, 77 Fla. 341, 81 So. 503; Bass v. Alderman, 80 Fla. 345, 86 So. 244.

These authorities are in accord with the decisions of the federal courts in reference to the question presented.

The laws of Florida under consideration are found in Compiled General Laws 1927. I shall refer in a general way to certain sections pertinent to this case.

Section 893: "All real and personal property in this State, and all personal property belonging to persons residing in this State, not hereby expressly exempted therefrom, shall be subject to taxation in the manner provided by law."

Sections 895 and 896 define real property and personal property. Personal property shall "be construed to include all goods and chattels, moneys and effects, all boats and vessels, all debts due or to become due from solvent debtors, whether on account, contract, note or otherwise, all public stocks or shares in all incorporated or unincorporated companies."

Section 904 defines taxable money as meaning "gold and silver coin, United States treasury and bank notes, legal tender and all other forms of currency and every deposit which any person owning the same or holding in trust and residing in this State is entitled to withdraw in money on demand." "Credits" are in said section defined "to mean and include every claim and demand for money or other valuable thing, and every annuity or sum of money receivable at stated periods, due or to become due."

Section 907 provides for the taxing of stocks in incorporated companies as personal property, including shares in state organized banks, requiring the bank to pay the tax on the stock of its shareholders. The residence of the shareholder is not considered.

Section 908: "Any banking, loan or trust company or corporation or any person acting as the agent of another, and, having in his possession or under his control, or management, any money, notes, credits or personal property belonging to such other person, with a view to investing or loaning or in any other manner using the same for pecuniary profits, shall be required to return the same for assessment at the real value, and such company, corporation or person shall be liable for the tax on the same; and if such company, corporation or person refuse to list such property on a return for assessment or to swear to the same, the amount of such money, notes, mortgages or credits shall be listed and valued according to the best knowledge of the assessor."

Section 909: All steamboats, dredge boats, sailing vessels, wharf boats, barges and other crafts are taxable "in the county in which the same may belong or be enrolled, registered or licensed."

Section 913: "Between the first day of January and the first day of July in each year, the county assessor of taxes in each county * * * shall ascertain by *diligent inquiry* the names of all taxable persons in his county, and also all of their taxable personal property, and all taxable real estate therein, on the first day of January of such year, and shall make out an assessment roll of all such taxable property." Assessments of property and real estate shall be kept separately.

Section 915: "When a person is assessed as a trustee, guardian, executor, or administrator, a designation of his representative character shall be added to his name, and such assessment shall be entered upon a separate line from the individual assessment."

Section 917 requires every person holding property to return the same for taxation on or before the 1st day of April of each year. Upon a failure so to do, the tax assessor makes out an assessment and valuation and the same "shall be deemed and held to be binding upon such owner or other person or corporation interested in such property, unless complaint is made of such assessment and valuation on the day set for hearing complaints and receiving testimony as to the value of any property, real or personal, as fixed by the county assessor of taxes."

Section 919: "All personal estate liable to taxation, the value of which shall not have been specified under oath as aforesaid, shall be estimated by the county assessor of taxes at its true cash value, according to his best judgment and information, and his failure by neglect or refusal to make such estimate shall be a cause of suspension by the Governor."

Section 929 provides that the county commissioners shall sit at stated periods as a board of equalization after the assessment roll is completed, to hear complaints for the purpose of "perfecting, reviewing and equalizing the assessment."

Section 937: The county commissioners fix the rate of taxation to be levied on the valuations in the tax assessment roll.

In the performance of the duties prescribed by these sections, the tax assessor is to be held to a reasonable compliance therewith. His discretion is limited to the fixing of value. He has no discretion in reference to omitting any property from his assessment roll which the law requires to be taxed. He

is under the duty to *diligently inquire,* which means that he shall use all his available sources of information to find taxable property owned or located in the county, both real and personal, so that every person shall bear a just proportion of the taxes and not escape his duty of contributing to the support of government, and also that taxpayers shall not pay an unjust proportion of the burden by reason of properties being omitted which might thereby reduce the amount which they would have to pay.

The Constitution of the State of Florida, section 1, article 9, provides: "The Legislature shall provide for a uniform and equal rate of taxation * * * and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal."

The provisions of the statutes which we have above referred to are pursuant to this declaration, and are the means provided for a uniform and equal rate.

At the outset, defendants call our attention to section 8 of article 9 of the Constitution of Florida, which provides: "No person or corporation shall be relieved by any court from the payment of any tax that may be illegal, or illegally or irregularly assessed, until he or it shall have paid such portion of his or its taxes as may be legal, and legally and regularly assessed."

Defendants assert that the plaintiffs do not tender the payment of any tax, nor have they paid any portion of same and therefore have no standing in this court. The constitutional provision, however, says that the tax which must be paid shall be legally and regularly assessed. Otherwise the imputation is that it need not be paid. In the case of Pickett v. Russell, 42 Fla. 116, 28 So. 764, this section is interpreted to mean that it does not require the taxes to be paid before the court adjudicates the challenge of illegality of the law, but must be paid before obtaining relief. The Florida cases cited hereinbefore hold, as the general rule of law is, that fraud vitiates every undertaking of government or the individual, and where the charge and proof is that the assessment roll is illegal by reason of conduct of the assessor, amounting in law to fraud, as alleged in the bill before us, the courts will assume jurisdiction, and if possible fix the proper amount of taxes the plaintiffs shall pay in final judgment; but where the assessment roll is wholly void by reason of the conduct of the tax assessor, as alleged in the bill here, no taxes can be assessed or paid, and the plaintiff is relieved therefrom until there is proper assessment. I will not review the authorities hereinbefore cited on this proposition, but refer to them as substantiating the same.

The first question which presents itself in considering the evidence upon the facts is what method the tax assessor used in fixing his valuations on the assessment roll. The law requires that he shall assess all property at its full cash value. The practice of defendant assessor was not to fix for taxation purposes such full cash value in the first instance and then take a certain proportion of the same against which the tax rate would be levied to raise the amount necessary for governmental purposes. This percentage of the actual cash value may be such as the tax assessor and county commissioners may see fit, but it must be a uniform percentage, so that every taxpayer will pay an equal and uniform rate. If 10 per cent. of the actual cash value of property is fixed for taxation purposes, then a taxpayer can easily ascertain that he is paying on 10 per cent. of the actual value of his property as fixed by the tax assessor. In this case, the tax assessor valued the property for what, in his opinion, it should be for taxation purposes, without reference to any percentage of its actual value.

In answer to the question, "May I Inquire what the percentage was that you endeavored to apply?" the assessor answered:

"I tried to make that percentage an equitable percentage. With the testimony that is given here, if I testified here on this stand that I assessed it at 10 per cent or 50 per cent, I would be wrong, according to the testimony that has been given. It is nearly impossible for me to say that I assessed property at a definite per cent. I tried to arrive at a piece of property, try to get as near as I can, what I figured to be the actual value of it and place a value on it, and from that I try to equalize everything else. * * * I will answer it this way, from the testimony I heard and my conversations with people, my tax roll runs around ten per cent, some goes up and some down.

"Q. You are basing that estimate of percentage upon the testimony that you have heard in this case? A. Some on this case and other information and testimony and talks and dealings with property and with property owners, I figure my values will run around that basis."

Further the witness stated: "I don't want you to understand me as saying that I do assess at 10 per cent or any per cent."

Further: "I don't know who owns a piece of real estate. When I go there to assess it, I have no way of knowing unless I go into the Clerk's office and check up the ownership of the property to know who owns that house. I go out there and hunt it up, locate it and assess it and I assess it unknown, I don't care who owns it."

In reference to his valuation of $91,000 on a Palm Beach property which sold for $2,800,000 he says: "It depends a great deal on the financial condition and the type of man that will buy that piece of property. The market is limited. The actual value to an ordinary person, ordinary man, as I see it, it has none. Now, a wealthy man will come there that has a great deal of money, more money than he knows what to do with, hasn't anything to do with it except to build that beautiful home there in the way he wants to build it. He spends his money; I may say, wastes his money; is very extravagant. He does not keep a proper check on his buildings, and it runs into vast sums of money. But to go there and figure it out and compute it on the cubic footage, I cannot see where it runs into those enormous figures. I give it a fair value and try to keep the ratio with other properties."

Further the witness testified that he was a member of the town council of Palm Beach: "We try to keep the town in good shape. I believe in reasonable taxation. I think we should do all we can to cultivate and encourage northern capital to come to Florida. They are the salvation of it; that is our biggest asset, and if we will do that and get more of these men that are able to build and come and spend their money in the community—it is not what they spend today, but over a period of years. It is our biggest asset and I believe we should make it as attractive as we can. But no one can ever say that I ever showed them any partiality in any way when it comes to assessment. If I did, Sir, it was done solely ignorantly and with no intent of fraud."

With such a method and frame of mind, the taxation values must necessarily lack uniformity and equality. It is a haphazard method of arriving at valuation.

The evidence discloses that the general valuations fixed by the assessor for the town of Palm Beach were less than the values fixed for the town of West Palm Beach. One witness testified that the assessor told him that it was necessary to favor Palm Beach property. There are many sumptuous homes on and near the ocean, where wealthy people have their legal residence or have property utilized during a portion of the winter months. These homes are filled with valuable furnishings. The evidence discloses a pitiful amount of personal property assessed to these residents of Palm Beach. The assessor testified that if he went to one of these homes and asked to enter to list taxable personal property therein, he would be told, "There's the street, young man, get out." Hence he kept to the street and made no further effort.

A great amount of evidence has been introduced by the respective parties concerning valuations of the plaintiffs' property and other property in the county for comparative purposes. Witnesses for the plaintiff and defendant vary greatly in their valuations. Taking the testimony as a whole, and the lowest valuations testified to by witnesses for the defendant, there is such a great difference shown in the actual value of real estate as to make clear the inequality and injustice of the assessor's values. The assessor presents no actual cash valuations made by him because he made none.

It would be too great an extension of this opinion to review in detail the testimony concerning each of the numerous parcels of real estate in evidence. A general summary for the years 1929 and 1930 will serve our purpose, as set forth in plaintiffs' brief:

### Aggregate Values, Assessments and Percentages

| of Plaintiff's Properties | | Properties of Other Taxpayers | |
|---|---|---|---|
| 1929 Val by pff witnesses | $539,137.00 | $15,989,070 | pff wit for 1929 |
| " " " deft " | 699,965.00 | 8,577,877 | deft " " " |
| " Assessment thereon | 98,220.00 | $665,420. assessed value | " |
| " % assessed per pff wit. | 18.21% | 4.16% of val by pff wit. | " |
| " % " " deft " | 12.60% | 7.75% " " " deft " | " |
| 1930 Val by pff witnesses | $547,249.00 | $15,989,070 | pff wit for 1930 |
| " " " deft " | 616,417.00 | 8,581,046 | deft " " " |
| " Assessment thereon | 70,450.00 | $597,550 assessed value | " |
| " % assessed per pff. wit . | 12.87% | 3.73% of val by pff wit | " |
| " % assessed " deft " | 11.42% | 6.96% " " " deft " | " |

■ The plaintiffs have been discriminated against and injured by the method used by the assessor. Under the method used by the assessor, there was no way for him to keep any accurate check on his valuations of properties as related to each other. It necessarily resulted in inequality and lack of uniformity, and unconsciously he was led perhaps into discriminations and under and over valuations as the inevitable result. It is clear that he neglected to value millions of personal property by reason of his failure to diligently inquire into the available sources of information concerning the same which would have disclosed the facts. Real estate has borne an unjust burden of taxation by reason of the escape of millions of taxable personal property. It is to be regretted that taxpayers ignore their duty to make return of their taxable property. The assessor is not as helpless as he asserts in bringing them to law observance. Persons, and particularly corporations, should not be permitted to augment earnings by tax dodgings. The assessor has the arm of the law to aid him in the performance of his duty. He should not fear adverse public opinion nor attempt to bring popularity in the discharge of his duties, by indifference or by bandaging his eyes. The board of county commissioners in approving the tax roll and sitting as a board of equalization are as much chargeable in this case as is the assessor in bringing about the state of affairs disclosed by the testimony. "Where taxing officials assess in a manner which they must know will produce inequalities and unjust assessments, their acts are to be treated as arbitrary or fraudulent." Cummings, Treas. v. Merchants' Natl. Bank of Toledo, 101 U. S. 153, 25 L. Ed. 903; Nevada, Cal. Power Co. v. Hamilton, County Treasurer et al. (D. C.) 235 F. 317, 318.

The evidence abundantly supports plaintiffs' contention that a vast amount of taxable personal property was left off of the assessment rolls during the years in question. The assessor says that he sent out the requisite return blanks to all taxpayers in the county each year, but if no return was made thereto, he did not pursue the matter within his authority, particularly in reference to personal property, to make out a list and valuations against such persons, thereby compelling such persons to come into an open hearing and to contest his list, and to testify as to what was actually owned.

■ The evidence discloses that there were estates being administered by executors or administrators in Palm Beach county in 1929 and 1930 with personalty assets of more than $7,000,000, none of which appears on the tax assessment rolls. Assessors are charged with notice of the contents of probate records. Cooley on Taxation, 1055. "Wherever inquiry is a duty, the person bound to make it is affected with knowledge of all that he could have discovered had he performed the duty. Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge." 20 R. C. L. p. 347, § 7; Cordova v. Hood, 17 Wall. 1, 21 L. Ed. 587.

The law charges the assessor to make diligent inquiry. The assessor admits that he did not examine the probate records of the county at any time. The evidence shows that there was a great amount of personal property held by trustees, no return of which was made, and none of the property held by these appears on the assessment roll. Inquiry in the clerk's office and examination of the records therein would have disclosed to the tax assessor this property. The banks made no return. The assessor made no effort to find out, excepting a hesitant inquiry of some officer as to what property was held by them as trustee or administrator or otherwise, what money resident owners had on deposit, and in reference to other property held which was subject to taxation, but took the easiest way of not causing any trouble and ignoring all such property. The banks published annually a statement of their assets. This was a source of information to the tax assessor which he admits he did not consider.

The Central Farmers' Trust Company, as the evidence shows, on January 1, 1929, and January 1, 1930, had over $1,000,000 of personal property in its possession as executor, administrator, or trustee, all of which property was taxable, none of which was on the tax assessment roll. The bank has never made a return of such property for taxation. The assessor says when he talked with the bank officials about personal property returns, he was told, "Owens, you can not get it." And he now says, upon the disclosure by order of court, of the bank's holdings, that he will assess it "if the Board will let me," referring to the board of county commissioners. The assessor had by the use of the public records the opportunity to ascertain the information, despite the bank's attitude. He did not make "diligent inquiry." Banks should not be permitted by an assessor to escape taxation. Of all institutions, a bank should be careful to observe the law

536

and not shield itself or its trusts or its depositors from proper and just taxation.

The situation in reference to the bank above prevailed as to other banks in Palm Beach county, whereby the Assessor has neglected to include much taxable property in his rolls.

■ While it is true that the mere presence of money on deposit in banks does not necessarily render it subject to taxation, yet such money which is the property of residents of Palm Beach county is taxable, and the duty is upon the tax assessor to find such deposits. The law provides a way he may do so, but he has never seen fit to exercise his right. The plaintiffs present testimony showing that millions of dollars worth of taxable notes, mortgages, credits, and debts appeared upon the records in the clerk's office of said county during the years in question, one witness estimating the same at $20,000,000, all of which was left off of the assessment rolls. The assessor had a duty to inquire, examine, and determine what, in his judgment, these records disclosed. He says he has never done so. It is fair to presume that an inquiry by the tax assessor would find this amount to be largely exaggerated, but yet I am convinced from the evidence that there were many millions of dollars of such personal property which the assessor could have found legally subject to taxation, had he made diligent inquiry of the records in the clerk's office.

■ Intangible property in contemplation of law accompanies the person of the owner and is taxable at his domicile. The weight of authority is that such property in the hands of an administrator or executor is taxable at the domicile of the decedent or at the place of granting of letters of administration. The law requires that property held by one in trust must be assessed to him in his fiduciary capacity at the domicile of the trustee. State v. Beardsley, 77 Fla. 803, 82 So. 794; 800.

■ My belief is that the tax assessor did not, in his own mind, set about and intend to deliberately commit a fraud as such in the making of the assessment rolls. But his lack of diligent inquiry, his method in assessing

property, his leaving off some millions of dollars worth of personal property from the tax assessment rolls during the years 1929 and 1930 especially, his lower valuations of Palm Beach town real estate than in West Palm Beach, resulting in the inevitable discriminations and unequal and nonuniform valuations in the county, all of which have been systematically and intentionally pursued through the four years in question, establish fraud in law. Taxpayers and the plaintiffs here are grievously injured by an unjust burden of taxes under these circumstances.

■ It has been brought out in the testimony that during the years 1927 and 1928 the conditions in Palm Beach county were decidedly abnormal as far as knowing what property anybody had or what its cash value was. The hurricanes of 1926 and 1928 injured and destroyed a vast amount of property in this county. Most of the banks failed. The collapse of the boom left this county in a deplorable condition. Its public indebtedness was enormous. I am impressed with the fact that if the tax assessment roll is held illegal and void during these years there could not be added to it the property which the assessor deliberately omitted, because the largest part of the same has been lost by one means or another as aforesaid, and it would be a useless task to have a reassessment. Equity will not do a useless thing. But the assessment rolls of 1929 and 1930 were made up during a recovery period where values were more or less stable and ascertainable, and property left off of the said assessment rolls is still in existence, to be reached for taxation purposes. The plaintiffs have sustained the burden of proof imposed upon them.

The injunction as to the tax assessment for 1927 and 1928 will be dissolved, and plaintiffs are required to forthwith pay the taxes assessed for those years on their property. The injunction for the years 1929 and 1930 is made permanent. The tax assessment for those years is held to be void.

A decree in conformity with this opinion may be prepared.