

# THE ATTORNEY GENERAL
# OF TEXAS

## AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

February 16, 1949

Hon. William N. Hensley
Criminal District Attorney
San Antonio, Texas

Dear Mr. Hensley:                    Opinion No. V-776

                                     Re:  Several questions
                                          relating to ren-
                                          dition and assess-
                                          ment of property
                                          for ad valorem
                                          taxation.

        You request the opinion of this office upon
the questions set out below as follows:

        "(1)  What is the percentage of the
    fair cash market value of property upon
    which a taxpayer may make a sworn rendi-
    tion; in other words, can the taxpayer
    legally render his property at, say,
    forty percent of the fair cash market
    value?

        "(2)  Should the Tax Assessor ad-
    vise persons making renditions that the
    rendition must be on the true and full
    value; that is to say, the fair cash
    market value of the property?  Is it the
    duty of the Tax Assessor to refer to the
    Board of Equalization such renditions as
    are not made at the fair cash market
    value?

        "(3)  At what percentage of fair cash
    market value may the Tax Assessor assess
    unrendered properties when he makes his
    assessment on such unrendered properties?

        "(4)  At what values can the Board of
    Equalization set the assessed values of
    property before them for consideration?
    May the Board of Equalization set a value
    of less than the fair cash market value?

What is the effect of the 'uniformity' pro-
vision of the statutes?  In other words,
may the Board set a value on a particular
piece of property at the fair cash market
value while the standard for property as-
sessments generally is at forty percent of
the fair cash market value?"

We shall not attempt to answer your questions
categorically, for as we perceive your primary concern
is:  What significance is to be attached to the several
constitutional and statutory provisions pertaining to
the value at which property is to be assessed for ad
valorem taxes?

Preliminary to our discussion of this ques-
tion, it may be observed that the duties of the tax-
payer, the Tax Assessor-Collector, and the Board of
Equalization have been definitely defined by statute.
An excellent summary from which may be gathered the
narrow function of an "assessment" is contained in the
case of Crocker v. Santo Consolidated Independent
School District, 116 S. W. (2d) 750 (C.C.A. . . . 1938)
expressed in the following language:

"Some confusion is manifest. . . regard-
ing the nature and functions of renditions of
property and assessments of property, particu-
larly manner of listing or otherwise evidenc-
ing rendition and assessments.

"It should be borne in mind that a tax-
payer never assesses his property for taxes.
Not even a commissioners' court has author-
ity to do that.  The assessment of property
is peculiarly the duty and responsibility of
a tax assessor.  The jurisdiction of the com-
missioners' court with reference to assess-
ments is confined to raising or lowering
assessments as incident to its duties as a
board of equalization.  It has no power to
add property to the tax rolls not previously
assessed, nor to take property from them . . .

"The taxpayer lists or inventories pro-
perty by describing it and placing a value
upon same.  He may make the list himself, or
merely furnish the information to the assessor.
If the assessor agrees to the rendered valua-
tions, he the assessor, makes the rendered
valuation the assessed valuation, or, if he

> does not agree, he is required to note the
> assessed value on the same list, subject
> in either case, to final action by the
> board of equalization as to raising or low-
> ering it. R. S. 1925, Art. 7211. Thus
> the rendition lists become also assessment
> lists. When after legal levy such assess-
> ment lists are corrected and approved by
> the board of equalization the liability of
> a taxpayer is thereby fixed."

In addition to the provisions of Article 7211,
V. C. S., other statutory provisions direct the Assess-
or-Collector to transmit to the Commissioners' Court,
sitting as a Board of Equalization, assessments of ren-
dered and unrendered property which have been made to
him. After the Board of Equalization has equalized the
values, the Assessor-Collector then proceeds to assess
all unrendered property as required by Article 7218,
V. C. S.; to prepare rolls or books of all rendered or
unrendered real and personal property as required by
Article 7218 and 7219, V. C. S.; on or before August 1
to transmit to the Board of Equalization his rolls or
assessment books with his affidavit attached thereto
in the form directed by Article 7222, V. C. S.; and
the Board of Equalization after it has examined and
approved the rolls or assessment books transmit copies
to the Comptroller, County Clerk and the Assessor-
Collector as prescribed in Article 7224. The Assessor-
Collector's tax rolls, as finally equalized and ap-
proved by the Board of Equalization and delivered,
constitute the assessment upon which the Tax Collector
proceeds to collect the taxes assessed by the Assessor
and as equalized by the Board of Equalization.

We now pass to the question in which we think
you are primarily interested. That is, the standard of
fixing the value upon which taxes are ultimately as-
sessed and collected. There are three constitutional
provisions which should be noted. Article VIII, Sec-
tion 1, of the Constitution provides:

> "Taxation shall be equal and uniform.
> All property. . . shall be taxed in propor-
> tion to its value, which shall be ascer-
> tained as may be provided by law."

Section 11 of the same Article provided:

> "And all lands and other property. . .

shall be assessed at its fair value."

Section 20 of the same Article provides:

"No property of any kind in this State shall ever be assessed for ad valorem taxes at a greater value than <u>its fair cash market value</u> nor shall any board of equalization of any county or political subdivision or taxing district within this state fix the value of any property at more than <u>its fair cash market value</u>."

The following statutory provisions also deal with the question of value.

Article 7149 provides in part:

"The term 'true and full value' wherever used shall be held to mean the fair market value, in cash, at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale."

Article 7174 provides:

"Personal property of every description shall be valued at its true and full value in money."

We think that the apparent confusion as to value which would seem to arise by these numerous statutory provisions for the guidance of tax administrative officials is dispelled by the case of West Texas Hotel Company v. City of El Paso, 83 S. W. (2d) 772 (C. C. A.), holding that there is no substantial difference in the terms (1) market value, (2) fair market value, (3) cash market value, (4) fair cash market value, (5) reasonable cash market value, and (6) true and full value in money, which terms appear in various constitutional and statutory provisions pertaining to value for the assessment of taxes. Since our courts have held that the various terms used in the Constitution and Statutes as a basis of value for assessing taxes are synonymous, we shall use for the purpose of this opinion the term "fair

cash market value" used in Section 20 of Article VIII of the Constitution, supra, and the term used in Article 7149, V. C. S., "fair market value in cash", which clearly are equivalent terms. No provision similar to Section 20 of Article VIII was in the Constitution prior to its adoption August 23, 1937, and it did not become effective under its express terms until January 1, 1939.

Clearly, from the Constitutional and statutory provisions above mentioned, it is lawful for the Tax Assessor-Collector to assess and the Commissioners' Court to equalize property assessments at the full cash market value. If there were not court interpretations to the contrary, one would conclude from the above provisions that this was the only legal standard which could be used. However, there have been numerous court decisions which hold that the taxing authorities may use a lesser value if the standard is uniformly applied to all taxable property. Therefore, in the light of the court decisions, the taxing authorities are free to elect whether they will assess and equalize at the full cash market value or a lesser percentage thereof, so long as the percentage is uniformly applied to all taxable property. It is worthy to note that Section 20 of Article VIII of the Constitution, which became effective January 1, 1939, does not specifically forbid an assessment at less than the fair cash market value, but expressly forbids an assessment upon a valuation greater than such value. Uniformity of assessment is the end to be achieved, the absence of which is forbidden by the Constitution. Our Supreme Court so held in the case of Lively v. Missouri Kansas Texas Railway Company of Texas, 120 S. W. 852, speaking through Justice Brown, in the following language:

"But, as stated before in this opinion the wrong which was inflicted upon the appellee was not in requiring it to pay taxes upon the full value of its property, but in denying to it the equality of taxation secured by the Constitution, which equality of taxation necessarily depends upon uniformity of assessment."

In this case the Railroad Company objected to the 100% valuation upon its intangible assets for the purpose of assessing taxes against it in Dallas

County, which County adopted a 66 2/3% value applicable to property generally in the County, and in settling this difficulty, the Supreme Court said:

"In administering the remedy, the court must take the course which is most practical to secure uniformity of valuation of the property to be taxed. This may be done either by increasing the assessment of each property owner in the county to its full value and to collect from each the taxes upon this full value, or to reduce the assessment of the intangible assets of the railroad company to 66 2/3 per cent on the $100 of its assessed value. The court will adopt that plan which is most feasible and calculated to secure justice to the parties. . . The Court is placed in a dilemma, from which it can only escape by taking that path which, while it involves a nominal departure from the letter of the law, does injury to no one, and secures that uniformity of tax burden which was the sole end of the Constitution. To hold otherwise is to make the restrictions of the Constitution instruments for defeating the very purpose they were intended to subserve. It is to stick in the bark, and to be blind to the substance of things. It is to sacrifice justice to its incident.

"It would be utterly impracticable to increase the assessment of all other property owners in Dallas County to its full value, therefore a court of equity will adopt the other method—reducing the assessment made by the state board to the same proportion of value as was placed upon the mass of property in the county. . ."

The principle laid down by Judge Brown in this case has not been departed from, but uniformly adhered to as will appear from quotations from the following cases:

In City of El Paso et al. v. Howze, 248 S. W. 99 (writ of error denied), which dealt with a City Charter provision requiring rendition and assessment at a "fair market value", the Court said:

"The assessor and collector of the city of El Paso is the officer upon whom is imposed the duty of making the initial valuation of property rendered for taxation. The law has established the basis of the valuation to be "its true and full value in money" (article 7530, R. S.), or as it is termed in article 7569. R. S., "its reasonable cash market value."

"In the valuation of property the function of the city council is limited to that of a board of equalization. When exercising such function, it has the authority not only to equalize values but to see that all property has been assessed at its fair market value. But before such board can increase the value of property theretofore assessed it must give notice to the owner and afford him a hearing.

"In this case Howze rendered his property to the assessor and that officer approved and accepted the valuations placed thereon. This valuation by the assessor was a quasi judicial act and was not subject to increase except by the board of equalization after notice and hearing. No notice was given, no hearing was afforded, and without the consent of the taxpayer the valuation was changed and increased by the assessor, acting under the order of the city council made in its legislative capacity, on August 14th. We are of the opinion that such increase was invalid. . .

"The evidence shows that for a long time it has been the custom of the city to assess property upon the basis of 60 per cent. of its actual or market value and the value which the assessor placed upon the plaintiff's property in the original assessment was estimated upon that basis. But an assessment made by the assessor upon that basis

when _uniformly applied_ to all other taxable property is not invalid.  Green v. L.
& I. R. R. Co., 244 U. S. 499, 37 Sup. Ct.
673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88;
Taylor v. L. & N. R. R. Co., 88 Fed. 305,
31 C. C. A. 537; Camp Phosphate Co. v.
Allen, 77 Fla. 341, 81 South. 503.

"On the contrary, it is valid and
must stand as made until corrected by the
proper reviewing authority and in the manner prescribed by law."

See also the statement by the Waco Court of
Civil Appeals in Duvall v. Clark, 158 S. W. (2d) 565,
from which we quote as follows:

"And it is well settled that an assessment at less than actual or market
value when uniformly applied is valid."

To the same effect, the Supreme Court of the
United States in the case of Greene v. Louisville R.R.
Co., 61 L. Ed., U. S. 242, 1280, stated in the following language:

"It is equally plain that it makes
no difference what basis of valuation--
that is what percentage of full value--
may be adopted, provided it be applied
to all alike.  The adoption of full value
has no different effect in distributing
the burden than would be gained by adopting 75 per cent, or 50 per cent, or even
10 per cent as the basis--so long as
either was applied uniformly."

It is, therefore, apparent that the custom
of fixing valuations at a percentage of the full 100%
value  for the purpose of taxation is legal if equally auu uniformly applied to all taxpayers and property
of the County.  We do not mean to imply that we approve the percentage method as the one that should be
generally accepted by the ~~Tax Assessor~~-Collector and
Board of Equalization, if an assessment at less than
the full "fair cash market value" seems adequate to
meet the fiscal needs of the taxing authority, but
merely hold that the same is not illegal if equally
and uniformly offered to all persons and property

within the jurisdiction of the taxing authority. You ask what remedial action can be taken by the Bexar County Commissioners' Court if it does not agree with the percentage assessments of the Tax Assessor-Collector and desired that they be raised to full cash market value. The Court, sitting as a Board of Equalization, after due notice to each taxpayer affected, has the authority under Article 7206 to raise the values not to exceed 100%. By the same method, the Court has the authority to lower assessments so long as all are given equal and uniform treatment.

## SUMMARY

The Constitution and Statutes of this State require uniformity of assessment of real and personal property at full cash market value, but the courts have held that assessments at a lower percentage of market value are valid if equally and uniformly applied to all taxable property. Therefore, the taxing authority may require all property to be assessed at 100% market value or any fraction thereof equally and uniformly applied. Lively v. Missouri Kansas Texas Railway Company of Texas, 120 S. W. 852; Duvall v. Clark, 158 S. W. (2d) 565; City of El Paso et al. v. Howze, 248 S. W. 99; Greene v. Louisville R. , 61 L. Ed. U. S. 499 ; Texas Constitution, Article VIII, Sections 1, 11 and 20; Articles 7149, 7174, 7211, 7218, 7219, 7222 and 7224.V.C.S

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By

L. P. Lollar
Assistant

APPROVED:

Price Daniel
ATTORNEY GENERAL

LPL:jmc