**RAYONIER INCORPORATED v. TAX ASSESSOR, et al.**
No. 3080.

Circuit Court, Nassau County.

January 11, 1967.

William H. Adams, III and Gerald B. Tjoflat of Mahoney, Hadlow, Chambers & Adams, Jacksonville, for plaintiff.

Thomas J. Shave, Jr., Fernandina Beach, and Judson Freeman of Bryant, Freeman, Richardson & Watson, Jacksonville, for defendants.

WILLIAM L. DURDEN, Circuit Judge.

*Final judgment:* This case is before the court upon the application of the parties for a final judgment. The court has considered the factual and legal issues raised by the pleadings, the oral testimony, the documentary evidence and the arguments of counsel submitted at the final hearing.

### A.  JURISDICTION, PARTIES AND VENUE

*1. Constitutional authority for suit*

The circuit courts of this state have exclusive original jurisdiction in all cases involving the legality of any tax, assessment, or toll.  Article V, §6, Florida Constitution.

*2. Statutory authority for suit*

Such actions are brought in equity and the court is required to inquire into and determine the legality, equality and validity of the tax or assessment and to render decrees setting aside such

taxes or assessments or any part of them which are contrary to law. §196.01, Florida Statutes 1965.

### 3. Jurisdiction over subject matter

Jurisdiction of the court over the subject matter is not questioned in this suit.

### 4. Statutory indispensable parties

The county tax collector and the state comptroller, both of whom were named as original defendants, are indispensable parties in any court proceeding contesting the validity of a tax assessment. §§196.03 and 196.14, Florida Statutes 1965.

### 5. Tax assessor necessary party

This court has determined in other cases that the county tax assessor is a necessary as well as proper party in litigation testing the validity of tax assessments. The tax assessor was not initially named as a party defendant but, with leave of the court, plaintiff amended its complaint and added the tax assessor as a party defendant.

### 6. Jurisdiction over the parties

The court has jurisdiction over the parties.

### 7. Venue

Under certain circumstances tax litigation involving the state comptroller must be brought in the circuit court in Leon County. The law provides, however, that in actions such as this suit shall be brought in the county where the property is situated. §196.14, Florida Statutes 1965.

### B. BASIC ISSUES CREATED BY PLEADINGS

### 1. Property involved

The property involved in this proceeding consists of land in Nassau County, which is improved with a manufacturing plant or pulp mill consisting of buildings, equipment and personal property used by the plaintiff in its business of manufacturing chemical cellulose from pulpwood.

### 2. Unlawful assessment

(a) Plaintiff alleged that the real property (including the land and buildings) comprising the mill had a just or fair market value of $1,410,500, whereas it had been assessed at $4,044,000.

(b) The plaintiff alleged that all of the personal property and equipment comprising the mill had a just value or fair market value of $5,787,300, whereas the assessor had assessed it for the year 1965 at a value of $7,133,600.

(c) Plaintiff alleged that the assessments on both the real and personal property were unlawful because the assessed values grossly exceeded the just valuation of the property and because the assessments had been made in an arbitrary and capricious manner.

(d) Plaintiff alleged that it had duly appeared before the board of county commissioners of Nassau County sitting as a board of equalization and complained that the assessed values were illegal, but that the board had refused to grant any relief.

(e) The tax collector and the comptroller denied all the material allegations of the complaint. The assessor's answer likewise denied the material allegations of the complaint, but admitted that the plaintiff had appeared before the board of equalization to protest the assessed valuations of the property involved in this proceeding. The assessor alleged, however, that plaintiff had failed to file tax returns of its property as required by law, and that it had failed to furnish him information concerning its property which would have assisted him in valuing plaintiff's property.

(f) Although the issue was not specifically raised by defendants in their pleadings, they contended at the pre-trial conference and at the final hearing that plaintiff was precluded from obtaining relief from the assessment of its personal property because it had neither filed its return under oath nor appeared before the board of equalization under oath as required by law.

## 3. Discretion of tax assessor

Defendants contend that (especially under §193.14) the tax assessor is vested with broad discretion in making assessments, that the assessor was entitled to use his best judgment and information, and that the assessments of plaintiff's property for the year 1965 are not so greatly at variance from the fair market value of the property as to be grossly fraudulent or arbitrary. Therefore, defendants assert that the assessed values may not be successfully challenged. Plaintiff has argued that the assessor's discretion was abused because the assessed values do grossly exceed the market value and because they were arrived at in an improper manner.

## 4. Other issues

There are other subsidiary questions of law and fact that will be discussed and determined later in this judgment.

## C. LAWS ON ASSESSMENTS — GENERAL

### 1. *Constitutional provision*

The legislature is required to provide for a uniform and equal rate of taxation and to prescribe such legislation as shall secure a just valuation of all property, both real and personal. Article IX, §1.

### 2. *Statutory provision*

§193.021, Florida Statutes 1965, provides —

The county assessor of taxes of the several counties shall assess all the real and personal property in said counties in such a manner as to secure a just valuation as required by section 1, article IX of the state constitution. In arriving at a just valuation, the county assessor of taxes of the several counties shall take into consideration the following factors:

(1) The present cash value of the property;
(2) The highest and best use to which the property can be expected to be put in the immediate future; and the present use of the property;
(3) The location of said property;
(4) The quantity or size of said property;
(5) The cost of said property and the present replacement value of any improvements thereon;
(6) The condition of said property;
(7) The income from said property.

Subsections (5) and (6) relating to the equipment and other tangible personal property will play a major role in this case.

### 3. *Supreme Court opinion — Walter v. Shuler*

In a unanimous opinion (176 So. 2d 81) the Supreme Court of Florida affirmed the decision of this court in Walter v. Shuler, 24 Fla. Supp. 116, in which this court required a reassessment on the basis of fair market value of all the property in Duval County. In the opinion Justice Thomas stated —

We have said much about "X", the unknown quantity, and nothing about how to set it within the bounds prescribed by the legislature in Sec. 193.021. The more we ponder the problem the more difficult the solution appears, but settle it we must, and we have concluded after earnest study that the sensible way to do so is to adopt the chancellor's idea that "fair market value" and "just valuation" should be declared "legally synonymous" and that such is the best way to arrive at the definition of "X". The former term is a familiar one and it in turn may be established by the classic formula that it is the amount a purchaser, willing but not obliged to buy, would pay to one willing but not obliged to sell.

\* \* \*

If assessors will apply that test and in doing so observe the seven guideposts in Sec. 193.021, justness should be secured to the taxpayer and the tangle that has developed should be unraveled. 176 So. 2d 81.

## D. ADMINISTRATIVE PRACTICES AND PROCEDURES

### 1. *Tax returns*

§193.12, Florida Statutes, requires every taxpayer to file a return under oath of all of his real and personal property. §200.08 is a similar provision. It requires all taxpayers to file a return under oath covering their tangible personal property. The requirement that tax returns be under oath is somewhat clouded by the provisions of §192.57, which provides that no tax return required by law need be made under oath, and that if any return is false the person making it is guilty of a misdemeanor.

§193.13 provides that the tax assessor shall require any person providing a list of his personal property to make an oath that the list is correct, and if he refuses to take an oath he shall not thereafter be permitted to reduce the valuation placed upon the property by the assessor. This section applies only when a return has been made. It imposes upon the tax assessor the duty of requiring an oath in appropriate cases. It specifies detrimental consequences to the taxpayer only if he *"refuses"* to take an oath.

In this case the plaintiff filed no returns at all. The only two statutory provisions dealing with failure to file a return are §§193.12 and 200.35. The former section provides that unless a taxpayer files a return of his real or personal property the tax assessor's assessment is binding upon him "unless complaint is made of such assessment and valuation on the day set for hearing complaints and receiving testimony as to the value of any property, real or personal, as fixed by the county assessor of taxes." It would appear that a taxpayer has the alternative of either filing a return *or* appearing before the board of equalization.

§200.35 relates only to tangible personal property. It permits the imposition of a ten percent penalty upon taxpayers who fail to file a return of tangible personal property.

The defendants contend that because plaintiff failed to file any returns of its property, it may not complain about the valuation placed upon its property by the tax assessor. They cite several cases culminating in Robins v. Daniel, (1942) 151 Fla. 199, 9 So. 2d 381. The cases cited by defendants do not support their contentions. In the Robins case the court was dealing with the problem of back assessments for three years, for which no return had been filed, and an assessment for a later year in which the taxpayer had filed a return. The Supreme Court specifically pointed out that none of the assessments had been arbitrarily made or was illegally excessive. None of the authorities cited

by defendants hold that failure to file a return precludes relief if the taxpayer complains to the board of equalization. Several cases hold to the contrary.

In C.D. Utility Corporation v. Maxwell, (Fla. App. 4th 1966) 189 So. 2d 643, the court held that the statutory provision for a ten percent penalty for failure to file a personal property tax return made it clear that the legislature did not intend to deprive the taxpayer of the right to have his assessment reviewed merely because he failed to file a return. The court said —

> Florida Statutes, §200.35, provides for the imposition of a 10% penalty against taxpayers who fail to return their tangible personal property for taxation. Statutes imposing a penalty must always be construed strictly in favor of the one against whom the penalty is imposed and are never to be extended by construction. 24 Fla. Jur., Penalties and Forfeitures.

> To deny an owner who has failed to file his required tax return the right of having the validity of an assessment judicially or administratively reviewed is to deprive such owner of his property without due process of law and to expose him to the imposition of arbitrary penalties beyond those provided.

In Mariani v. Schleman, (Fla. 1957) 94 So. 2d 829, the Supreme Court held that a taxpayer who had failed to file a return *and had also failed to appear before the board of equalization* to protest could not thereafter successfully attack the assessment.

It is obvious that the principal purpose of the return and the hearing before the board of equalization is to provide the tax assessing officials with information on the claims of the taxpayer so that they will have an opportunity to consider the position of the taxpayer before making a final administrative determination of his assessment. §193.12 clearly states that the failure of the taxpayer to file a return results in the assessor's assessment being final only if the taxpayer fails to complain to the board of equalization. Although the taxpayer did not file a return, it did appear at the appointed time before the board of equalization. One or the other is a necessary condition precedent to a judicial review of administrative action — but either action appears to satisfy this requirement.

The court is aware, as counsel for both the parties admitted in their arguments, that prior to the reassessment program in 1964 practically no taxpayer either in Nassau or any other county complied with the technical statutory requirement of filing a return. As we move into the practice of fair market value assess-

ments on all property, the necessity for filing returns will be compelling.

Equity abhors an abortive determination of litigation for technical failures, and the court concludes that if plaintiff properly appeared before the board of equalization, its failure to file the return does not constitute either a legal or equitable barrier to a determination of this case on the merits.

## 2. *Appearance before board of equalization*

Defendants admit plaintiff complained of the assessments at the hearings held by the board of equalization. They urge, however, that plaintiff did not appear before the board within the meaning of the statute (as it applies to the personal property involved in this suit) because its agents did not testify under oath. Two statutory sections deal with this problem. §193.27 makes it unlawful for a board of equalization to reduce the valuation of personal property not specified by a taxpayer under oath. It imposes a fine upon the county commissioners if they do so. §200.11 requires complaining taxpayers to give a list of their property under oath and goes on to provide that *"if any person refuses"* to make an oath the board shall not reduce the valuation.

§200.22 of the statutes is a similar provision. It says that "if any taxpayer shall make complaint to the board of equalization he shall be fully heard under oath."

There is no evidence that the board of equalization required, requested or even suggested that the taxpayer's agents make their complaint under oath. There is no evidence that they "refused" to give their testimony the dignity of an oath as required by the statutes.

The duty is upon the board, not upon the taxpayer, to determine the level of dignity of the testimony given before it.

The board is responsible for the conduct of its own proceedings, and the manner in which they are conducted is under its control. None of the sections cited by defendants indicates that the taxpayer has any responsibility to put himself under oath. To the contrary, the statutes indicate that the taxpayer is not to be penalized unless he "refuses" to give sworn testimony.

The taxing officials had the opportunity to hear and give consideration to the position and arguments of the taxpayer. The purposes of these various statutes has therefore been fulfilled.

The formality or informality of the proceedings was entirely within the control of the board. Defendants may not take advan-

tage of the board's own failure to perform the duty imposed on it by the statute.

The court concludes that if the assessments complained of were illegal, plaintiff is not precluded from obtaining relief because it failed to file a return or because its agents were not under oath when they appeared before the board of equalization.

### E. VALIDITY OF THE 1965 ASSESSMENTS

### 1. Assessment history

The total assessment of plaintiff's mill for 1963 was $3,105,000. That valuation represented 12.83% of the entire tax roll of Nassau County for that year.

In 1964 there was a growing demand throughout the state to equalize assessments and broaden the property tax base. This resulted in several major suits by which tax assessors were compelled to establish all assessments at fair market value. The first of those suits was brought and determined in the sister county of Duval and that case was affirmed by the Supreme Court. On June 8, 1966 the Supreme Court handed down its opinion in Burns v. Butscher, 187 So. 2d 594, which compels all of the tax assessors in the state to comply with the requirements of fair market value assessments.

The tax assessor of Nassau County voluntarily and without the interposition of any judicial action instituted a revaluation program in which he attempted to assess all of the property in this county as required by law. As the judge who has heard and retained jurisdiction of the tax assessment roll in Duval County for over two years, I compliment the defendant assessor on his efforts to comply with the law without the expense to the county of extensive litigation.

In connection with his reassessment program the assessor originally proposed a valuation of $8,500,000 on all the property constituting the plaintiff's mill. After negotiations between plaintiff and the assessor the final assessment for 1964 was reduced to $6,986,000. The assessor admitted at the hearing that in 1964 he had attempted to assess the mill at its fair market value.

Although the assessment of plaintiff's mill increased by approximately 220% from 1963 to 1964, its percentage of the total tax roll decreased from 12.83% to 10.9%.

The assessor admitted that after the reassessment program he came under considerable public pressure and that he had received many complaints from taxpayers because their taxes had increased while the plaintiff's taxes had not.

Between 1964 and 1965 the tax assessor did not visit plaintiff's mill and when he made the 1965 assessment he had no more information concerning the property comprising the mill than he had had when he made the 1964 assessment. Nevertheless, in 1965 he increased the assessed valuation of the mill from $6,986,000 to $11,177,600. As a result the assessed value of plaintiff's mill became 14.96% of the tax roll, over 2% of the roll more than it had been before the 1964 reassessment program was begun.

## 2. *Manner of arriving at the 1965 assessments*

As stated in the preceding section the increase in the assessment from $3,105,000 in 1963 to an assessment of $6,986,000 in 1964 was based on a general reassessment program.

The increase in the assessment in 1965 to $11,177,600 was not based on any reappraisal of this property nor on a general reassessment program.

Obviously the assessor used some sort of mechanical basis of multiplication to get the higher figure. He denied it but the implication is overwhelming.

A tax assessment is illegal if the tax assessor arrived at the assessed valuation without considering the factors enumerated in §193.021, which determine the market value of the property assessed.

In Graham v. City of West Tampa, 71 Fla. 605, 71 So. 926, the taxpayer sued to declare an assessment illegal. The property was assessed at approximately $4,000, whereas the taxpayer alleged it was worth only about $2,000. The taxpayer charged that the assessment had been fixed arbitrarily and not on the basis of evidence which would have enabled the assessor to arrive at a fair value. The Supreme Court said —

> Valuations for taxation must have a just relation to the real value of the property assessed, and there must be no substantial inequality in valuations in the various kinds and items of property that is subject to the tax. The means and methods *prescribed for ascertaining the value of the property for tax purposes must be substantially observed and followed, or else the assessment will be invalid and a taking of property without due process of law.* (Italics added.)

> While the law affords a range of discretion to the officer authorized to ascertain and determine valuations of property for purposes of taxation, when the officer proceeds in accordance with and substantially complies with the requirements of law designed to ascertain such values, yet, if the steps required to be taken in making valuations are not in fact and in good faith actually taken, and the valuations are shown to be essentially unjust or unequal, abstractly or relatively, the assessment is invalid.

In the Graham case, plaintiff's essential complaint was that the assessor had not visited and inspected the land and was unacquainted with its value.

The same result was reached in Camp Phosphate Co. v. Allen, (1919) 77 Fla. 341, 81 So. 503. There plaintiff's land was assessed as phosphate land because of the geographical area in which it was situated. The court recognized that mere errors of judgment would not support a claim of invalidity. It, nevertheless, held that the assessment was invalid, saying —

> Valuations for taxation must have a just relation to the real and known value of the property assessed, and not to some unknown and speculative values, and there must be no substantial inequality in valuations in the various kinds and items of property that is subject to tax . . . When the assessor has not sufficient knowledge or information of the real value of a mineral deposit upon which to base a fair and equitable valuation, he should assess the land, upon some basis of known value obtainable as required by law.

West Virginia Hotel Corporation v. W. C. Foster Co., 101 Fla. 1147, 132 So. 842 (1931), was a suit to enjoin the issuance of a tax deed on a hotel in West Palm Beach. It was alleged that plaintiff's property was overvalued because, among other things, depreciation had not been taken into account. Plaintiff alleged that the assessor had not visited or inspected the property and had made no effort to ascertain its cash value; therefore, he contended the assessment was arbitrary and not based upon any substantial evidence of the value. The court said —

> It will have been noted that the bill does not expressly allege that the overvaluation was intentional, though it does allege that the valuation was arbitrarily fixed by the assessor *without viewing the property or without any evidence upon which he could arrive at a fair and just estimate of its value.* In *City of Tampa v. Palmer,* supra, it was held that mere inadvertence or a bona fide mistake of judgment in fixing a valuation for taxation, does not in itself amount in law to a fraud, and that relief will not be granted by courts of equity solely upon the ground that the valuation is excessive, "unless such valuation is so obviously and flagrantly excessive as to amount in law to a fraud and clearly imputes to the tax assessor an intention to arbitrarily discriminate against the complaining taxpayer." (Italics added.)

In the foregoing cases two factors were present, overvaluation and an assessment made without a rational consideration of the elements affecting value. In each case the taxpayer was granted relief in equity.

The same result was reached in City of Tampa v. Colgan, (1955) 121 Fla. 218, 163 So. 577. In that case the assessor had

based his assessment on reproduction costs without taking obsolescence into account. The court said — "It follows that this method of assessment, if shown to have been materially prejudicial in this case constitutes a sufficient ground of equitable interference."

The question remains whether the method used by the tax assessor here resulted in an excessive and unlawful overvaluation of plaintiff's property.

## F. VALUATION

### 1. General comments

As the Supreme Court held in Walter v. Shuler, supra, all property in the county must be valued for assessment purposes at its fair market value. In arriving at his valuation, the assessor must take into account all favorable and unfavorable factors which a willing buyer and a willing seller would consider if the property were placed on the market for sale. Since the property in this proceeding is highly specialized, its valuation must be to a great extent hypothetical. Nevertheless, there are sufficient professional appraisal guidelines to permit the assessor and the court to arrive at a reasonably close approximation.

Textbook authorities confirm the conclusion that the search for "market value" or "fair market value" is the goal of professional appraising. Further, that those in the appraising and assessing field who really care about the dignity, prestige and future of their profession admit that they must discard the old formulas and phrases which fragmentize and frustrate their work, and which destroy public confidence in their integrity.

In the first place, there is really nothing new about the concept of market value. One of the authorities indicates that Confucius in the year 500 B.C., as the master, said to the scholar, "the value of thy property dependeth upon thy neighbor".

Another authority has it that Publius Syrus, nearly 2,000 years ago announced a simple definition of value, "everything is worth what the purchaser will pay for it".

The principles of law that have been established in Walter v. Shuler and other related cases confirm the fair market value concept.

### 2. Three approaches to value

The Encyclopedia of Real Estate Appraising, edited by Edith Friedman and published by Prentice-Hall (referred to herein as "Friedman") defines the various approaches to value as follows—

An approach to value is a method based on factual data, by which an indication of value is evolved. Three standard approaches to real estate value have been developed through the experience of professional appraisers: The Cost or Summation Approach, the Income or Capitalization Approach, and Market Data or Comparison Approach. The purpose of the approaches is to set up a zone of reasonableness and to support the final conclusion to value.

The Cost Approach requires an estimate of the current cost to reproduce or replace a property and the extent to which the property has depreciated. Reproduction or replacement cost, less depreciation plus land value, sets the upper limit of value for the property.

The Income Approach considers the stream of income which the property is likely to produce for an investor or user during its economic life, as compared with income derived from similar properties and compares the return on the investment with the return on other types of investment. Various techniques are employed for capitalization of the income stream into an indication of value.

The Market Data Approach consists of a comparison of the subject property with other similar properties which have been sold in the area, thereby establishing market reaction to the subject property.

## 3. General principles applicable to valuing industrial property

Friedman (page 317) defines an industrial property by using the following quotation from another work on appraisal as — "a combination of land, improvements, and machinery which has been adjusted, synchronized, and perfected into a functioning unit intended for the assembling, processing, and manufacture of finished, or partially finished products from raw materials or fabricated parts, such as factories; and, a similar combination intended for rendering certain kinds of services, such as laundries, dry cleaners, storage warehouses; and for the production of natural resources, such as oil wells."

Friedman classifies industrial property as either "light" or "heavy" and as using either "continuous" or "interruptible" processes.

Plaintiff's mill is a heavy industrial property which operates on a continuous process basis. The testimony is clear that severe financial and mechanical problems are created whenever the mill is required to shut down for more than the temporary shutdown required for normal maintenance. In other words, the nature of its operation requires that it operate at a fairly high percentage of capacity or shut down completely. This is logical and 'understandable.

Friedman observes that the peculiar characteristics of industrial property pose special problems of valuation. They require the appraiser to have "a working knowledge of the economics

of plant location and its concomitants, raw materials, labor, transportation, and market for manufactured or distributed products."

The principal special characteristics of industrial property are summarized by Friedman as follows —

Greater tendency toward special-use design.
Greater average annual obsolescence rate.
Larger number of locational determinants.
Nonexistent speculative value in improved properties.
Reluctance of banks to make loans on industrial property.
Increased importance of credit rating of occupant.

The special use design of industrial property creates an abnormally high rate of obsolescence. The following quotation from Friedman is particularly descriptive of the situation presented by plaintiff's mill (page 319) —

> Structures built to house a special process have little utility for any other purpose. The industrial appraiser's nightmare is the plant whose exterior surfaces (walls and roof) enclose an almost solid mass of honey-comb-like structural equipment. The equipment in a factory of this type is concerned with the manufacturing process, but it is as much a part of the real estate as the electrical system or heating plant, and usually must be so valued. This class of industrial property represents the highest degree of special-use.

> The abnormally high obsolescence rate of industrial property is partially an outgrowth of its special-use design. Since manufacturing plants are constructed for a specific occupant, they are unlikely to fit the exact requirements or desires of any other. For all except the original occupant, a degree of obsolescence has occurred before the plant has started operating.

> Another cause for the greater average annual obsolescence rate of industrial property is the ever-changing industrial scene. Modernization of manufacturing and handling methods, and a changed attitude toward workers, have taken place over the past decades. Production line techniques and automation on the one hand, and employee comfort and safety on the other, have been forcing industry to abandon older structures in favor of more modern installations. Many buildings erected less than 20 years ago can no longer compete with newer structures. A major portion of the loss in value must be attributed to functional obsolescence, not to wear and tear. To measure this loss, the appraiser must compare modern construction in the field to his subject property and evaluate the latter's shortcomings.

Beginning at page 341, Friedman describes the application of the various approaches to estimating the value of industrial property. All three approaches are potentially applicable, but as she observes (page 342) — "In property that is extremely special-use

in nature, the Cost Approach may be the only reliable guide to value; the Income Approach and the Market Approach may not be available, and the value estimate may have to be verified by a study of current trends in the subject industry".

### 4. Cost or summation approach applicable in this case

The property involved in this proceeding is a highly complicated operating complex which consists of tangible property operated as a part of plaintiff's overall business of manufacturing chemical cellulose. Income is derived not only from the goods produced at the mill but from such intangible factors as operating know-how, secret processes, plaintiff's worldwide marketing organization and many other elements which are not subject to ad valorem tax and which must not be wholly relied upon in valuing the plaintiff's property for ad valorem tax purposes without violating the Florida constitutional prohibition against an income tax. The undisputed testimony establishes that it would be impossible to determine what part of the income of the plaintiff's operation is derived solely from the property involved in this proceeding. Since pulpmills are apparently not leased there is no way by which the rental value of the property can be determined. In view of these circumstances, there is no basis for using the capitalization or income approach.

Plaintiff's appraiser, J. Alvin Register, Jr., testified to the sale in 1964 at a price of $6,000,000 of a paper mill which had been built in 1938 or 1939 in this general area. That mill had a production capacity comparable to that of the plaintiff's mill, and Register testified that in many other respects the two mills were similar. The parties were in agreement, however, that because of the few sales of pulp mills and because of their differing characteristics, the market data approach was not a reliable method of reaching market value. Register used his information about the sale of the other mill principally as a check on his opinion of value which was arrived at by the cost approach, and not as an independent estimate of value.

The cost or summation aproach is the only remaining approach to value, and the parties and the appraisers were in agreement that it is the proper approach to use in valuing the property here under consideration.

Application of the cost approach requires a determination of the cost which would be required to reproduce the property new as of the date of valuation, and an estimate of the amount of depreciation accrued to that date.

## 5. *Use of en masse appraisal techniques*

Defendants' appraiser, James A. Howze, gave his opinion of value on the basis of an appraisal of plaintiff's mill which he had made using what he termed "en masse appraisal techniques".

In 1964 his company, Howze & Associates, which specializes in setting up appraisal programs for tax assessors, had installed the Howze-A-Matic appraisal system in Nassau County.

This system constitutes an almost wholly mechanical application of the cost approach based upon construction cost factors prevailing in the county. The use of the system results in a unit valuation for different types of structures in the county from which the reproduction costs of those structures can be determined. The system also uses standard depreciation rates which are based upon the physical type of the particular structure under consideration.

Howze testified that the Howze-A-Matic system is periodically checked against sales in the market to be sure that its application achieves a proper relation to fair market value.

Howze distinguished en masse appraisals from fee appraisals. He testified that fee appraisals do not take into account the factor of uniformity and equality in appraising techniques used in valuing other property in the county. On the other hand, he said that one of the principal purposes of en masse techniques is to "assure that the properties are appraised equitably and uniformly within a geographical governmental unit."

The use by an assessor of some rather mechanical appraisal techniques is obviously necessary. With the large number of properties in any county the assessment task would be impossible to perform without some similar system.

Nevertheless, while uniformity and equality are important they are not an end in themselves. The test of any particular assessment is not whether it was arrived at by using the same mechanical techniques as other assessments in the county but whether the assessed value is reasonably close to the market value of the property under consideration. Therefore, a substantial difference between assessed value and market value cannot be completely justified on the ground that en masse appraisal techniques were used in determining the assessed value.

A large part of the property involved in this case is complex industrial equipment and machinery. Howze used the same en masse techniques in appraising the personal property comprising the mill as he did in appraising the real estate. This was so even though the Howze-A-Matic system as established in the county apparently applies only to real property.

It is clear from the evidence that even though the Howze-A-Matic system is based upon the cost approach, en masse appraisal techniques developed to appraise the ordinary run of property in a geographical governmental unit may be entirely inadequate to appraise a complex industrial property such as that involved in this case. This is particularly true in determining the depreciation suffered by the property. In view of the variable rate of obsolescence of industrial plants and equipment indicated by the textbook authorities the use of a standard depreciation rate based only on physical deterioration may achieve a result materially inconsistent with the legally required goal of fair market value.

## 6. Application of the cost approach to this case

(a) *Land.* The land originally cost $74,609. Plaintiff's appraiser valued it at $200,000. Defendants' appraiser valued it at $130,000.

(b) *Buildings and other structural improvements.* The buildings and other structural improvements had an original cost of $3,025,074. Howze estimated their reproduction cost new at $3,321,711, whereas Register estimated the cost at $3,276,302. Thus, the difference of opinion between the two appraisers on this issue is infinitesimal.

(c) *Personal property.* The situation is similar with respect to the personal property. It had an original cost of $15,973,237. The defendants' appraiser estimated its reproduction cost at $19,945,108. Plaintiff's appraiser estimated its reproduction cost at $21,917,450. The difference of opinion between the two appraisers on the issue of reproduction cost was within ten percent of each other and in fact, the estimate of plaintiff's appraiser was higher than the estimate made by defendants' appraiser.

Reproduction cost represents the higher limit of value. Except in unusual circumstances, if a property can be reproduced for a certain cost, no one would pay more than that amount to purchase it. Reproduction cost, however, means little by itself. Depreciation must be considered. The proper method of arriving at depreciation is the crux of this case.

## 7. Methods of determining depreciation

Depreciation is loss of value from any cause. It includes not only physical deterioration but economic and functional obsolescence. Economic obsolescence is obsolescence from factors entirely outside the property involved. Functional obsolescence results from factors within the property itself as a result of which

it is either not as attractive or does not operate as efficiently as more modern properties. Other text writers agree with Friedman that in most cases obsolescence causes greater loss in value than physical deterioration. This is particularly true in the case of well-constructed properties which are used in highly competitive business. (See McMichael's Appraising Manual, 4th Ed., pp. 52-66)

The precise measurement of depreciation may be impossible; however, depreciation may be estimated with reasonable accuracy. In determining what a property is worth well-informed buyers and sellers purchasing for business purposes need to estimate how much of the useful economic life of the property has been used up and how much remains. This is obviously the case since a buyer must expect to recover his investment plus a reasonable profit before the property loses its economic utility.

Determining remaining economic life requires that some estimate of the useful life of a property be made as the first step in determining the extent to which it has depreciated. In arriving at this estimate all factors detracting from value must be considered.

This does not mean that depreciation occurs along a steady, unvarying curve. Value is affected by so many factors that it can and sometimes does change rapidly. A property which has value today may because of some innovation be rendered valueless tomorrow. Nevertheless, valuation must be as of a certain date, and in arriving at an estimate of remaining life at that date one attempting to reach a value must estimate the useful life and how much of it has been exhausted. In doing this, he must use information which would then be taken into account by well-informed buyers and sellers. (Friedman, pp. 50-51; McMichael, Chapter 5).

8. *Competitive position of the product of plaintiff's mill in the market*

Plaintiff is engaged in a highly competitive business. The market for its product is worldwide and rapidly changing. New grades, which are in effect new products, are constantly being developed by the plaintiff and its competitors. These products challenge each other in the market. New grades which are developed frequently make existing grades unsalable.

Plaintiff's Fernandina mill was originally constructed in 1938. Most of the real and personal property was improved, constructed or installed in that year. In the 27 years since that date,

many scientific and technical developments have occurred in the industry. Newer mills have been built. These have greater volume capacity and are able to produce higher and more salable grades of dissolving cellulose. Consequently, the plaintiff has to go to extraordinary lengths in its sales and research efforts to make the grades of cellulose produced by its Fernandina mill marketable. The mill is able to remain in competitive operation only by bringing out new grades from time to time. This requires constant research and major capital expenditures for plant maintenance and improvement.

Plaintiff is planning to install certain new equipment at a cost of some $4,000,000. This equipment would not increase the mill's capacity to produce cellulose nor would it necessarily result in any increased profit. It appears necessary to enable the mill to keep producing salable pulp in the rapidly changing market. This, in itself, is some indication of the mill's obsolescence in terms of market conditions.

The mill is at a competitive disadvantage for another reason. It is the only mill in the world producing chemical cellulose by the sulphite process from southern pine. Because of this, it is probably the only mill which (when the market for chemical cellulose is weak) is unable to shift from producing chemical celluose to producing paper pulp, the market for which is much broader and more stable.

Based on this evidence relating to the competitive position of the product of plaintiff's mill in the market plaintiff contends the mill has suffered obsolescence which substantially outweighs the physical deterioration of the property itself.

Admittedly the factors discussed in this section would be considered by a well informed prospective purchaser contemplating an investment of around ten million dollars. Such a purchaser would consider such elements with all sorts of care and caution.

Obviously a highly complex multi-million dollar *single* purpose property has a value much more susceptible to fluctuation and speculation than a standard many purposed manufacturing plant or other property.

The defendants contend that as long as the mill is running at full capacity, which it has been doing, there is not substantial obsolescence to be properly considered.

Neither extreme conclusion is controlling for our present purposes. The facts in each contention must be considered because purchasers and sellers would consider them.

### 9. Functional obsolescence of particular departments

Plaintiff's witnesses, including Dr. Ferdinand Kraft, an eminent authority in the field of making pulp and paper, testified that not only was obsolescence a factor in evaluating the process of the mill as a whole but that obsolescence is particularly evident in certain departments of the mill. The wood yard is laid out and equipped in a way which necessitates double handling of wood and requires an excessive number of men in its operation. The chip plant (except for the newly added long-log portion of it) is particularly antiquated.

Competition in the industry requires constant increases in mill capacity to keep unit costs at a competitive level as labor and material costs rise. Most mills are therefore constructed so that their capacity can be increased. Plaintiff's mill has reached its maximum capacity. The pulp machine and rollers constitute a bottleneck which makes any further increase in mill capacity a virtual impossibility.

### 10. Income Tax Bulletin F and depreciation guidelines published by Canadian Pulp & Paper Association

In discussing methods of estimating the useful life of property, Friedman (p. 50) gives particular emphasis to Income Tax Bulletin F, 1955, published by the Internal Revenue Service —

> Tables showing the estimated useful lives of depreciable property are issued by the Internal Revenue Bureau, and may be obtained through the Superintendent of Documents, Washington, D.C. While these tables are intended to be used for income tax purposes, they may serve as a guide to the appraiser in estimating the extent of depreciation on a particular type of property.

McMichael (p. 67, et seq.) contains a similar endorsement of Bulletin F.

Bulletin F was introduced in evidence by the plaintiff. It contains a section on the estimated useful lives of pulp mill equipment, and another section on factory buildings. It gives varying lives for the different kinds of buildings and equipment used in pulp and paper making. The estimated lives contained in Bulletin F vary from 33 1/3 years to 45 years with respect to buildings, depending upon construction, and 4 years to 33 years with respect to equipment. The bulletin suggests a 20-year composite life for pulp mill equipment as a whole. Thus it purports to take into consideration not only the physical deterioration of the property involved but normal obsolescence in the industry.

Dr. Kraft identified a publication by the Canadian Pulp & Paper Association (the Canadian Guidelines) which gives a de-

tailed estimate of the estimated lives of various pulp mill equipment and structures. That publication contains 12 pages and seemingly gives an estimated useful life (including physical deterioration and normal functional obsolescence) for almost every conceivable kind of equipment used in pulp mills.

With respect to the useful life of buildings, the Canadian guidelines give estimates which vary from 12 to 60 years, depending upon the kind of construction. The estimated lives of mill equipment vary from a few years to a maximum of 30 years. Very few exceed 25 years.

## 11. Remaining useful life based on Internal Revenue Service determination

The plaintiff's tax manager testified that the United States Internal Revenue Service had made an engineering study of actual replacements at the plaintiff's various mills and that the depreciation taken on the plaintiff's books had been based upon the federal government's determination of the useful lives of the buildings and the various kinds of equipment used in the mills. He statistically computed from the plaintiff's books the average remaining life years of the property constituting the mill. He concluded that based upon the useful lives of the various items of property used in determining depreciation for income tax purposes the buildings and structures at the mill had a remaining life of 20.8 years and that the machinery and equipment had a remaining life of 7.8 years. He computed the average remaining life of all the property exclusive of land at 9.6 years.

## 12. Estimate of depreciation by defendants' appraiser

Defendants' appraiser estimated the depreciation of the buildings and structures, most of which had been built in 1938, at $1,091,504. This was approximately 38% of his estimate of reproduction cost or roughly 1% per year since the date of original construction. He initially estimated the depreciation on the personal property and equipment, most of which had also been installed in 1938, at $7,435,516. This was 37.3% of his estimate of reproduction cost or roughly 1.3% per year.

After hearing the testimony of plaintiff's witnesses, Howze increased the amount of depreciation which he had allowed on the equipment in the digester room, screen and bleach plant, machine room, finishing room and power plant. The aggregate increase in depreciation was $2,395,000, making his final estimate of depreciation $9,830,516.00 or 49% of his estimate of reproduction cost.

### 13. *Estimate of depreciation by plaintiff's appraiser*

Plaintiff's appraiser estimated the average useful life new of the buildings and structures at 45 years. On January 1, 1965, they were 26 years old. He testified that they had been subject to heavy and constant usage, and that in his opinion they had a remaining useful life of 20 years. He, therefore, used a base of 55% as a guide in determining depreciation and varied from this base where excessive depreciation was evident from his observation.

In estimating depreciation of the machinery and equipment, Register determined that the property had an economic life ranging from 15 to 20 years. He used a life of 25 years. He testified that life could be extended by improvements, additions and new accessories. On January 1, 1965, the plant was 26 years old. In his opinion, improvements had been made which had extended the life of the mill so that on that date it had a remaining economic life of approximately 10 years. The figure again was used as a guide with variations made in the specific amount of depreciation in the case of several departments of the mill which, in his opinion, either had no utility as in the case of the Ethynier plant or in which no modernization had taken place as in the case of the chipping plant.

### 14. *Assessor's opinion of value*

The assessor testified that in his opinion the value of plaintiff's real and personal property was equal to or perhaps greater than the assessed values which he had assigned to them. He testified that he had based his real property assessment on a previous study by Howze and that he had made the assessment of the personal property according to his best judgment. The real property was assessed at $4,044,000. The personal property, including inventory, was assessed at $7,133,600. The total assessment amounted to $11,177,600.

### 15. *Plaintiff's opinion of value*

Plaintiff's comptroller who had at one time been office manager of the plaintiff's mill at Fernandina Beach and who testified that he was intimately familiar with the mill and its equipment, gave his opinion that the book value of the mill as of January 1, 1965, fairly represented the actual value of the property. He testified that he was familiar with the rate at which depreciation was taken and that the depreciation taken on the books closely approximated the actual loss in value of the property involved. He testified that as of January 1, 1965, the book value of the

land and buildings comprising the mill was $1,374,622. The total book value of the personal property and equipment (exclusive of inventories) was $4,052,084. An exhibit placed in evidence during the testimony of plaintiff's tax manager showed what the book value of the property would have been had straight-line depreciation been taken. Some of the property at the mill had been depreciated on an accelerated basis. If straight-line depreciation had been taken, the book value of the buildings would have been $1,370,821.26 and the book value of the equipment and personal property (exclusive of inventories) would have been $5,165,532.34. The value of the inventories at the mill on January 1, 1965, was $1,099,579. As indicated above, the book values were based (whether on an accelerated or straightline basis) upon the engineering determination of useful life made by the Internal Revenue Service after an engineering study. The book value of all assets totalled $7,635,932.

### 16. Final opinion of value by defendants' appraiser

Defendants' appraiser testified that in his opinion the land was worth $130,000 and the buildings and improvements $2,483,000. Thus, the total value of the real estate was in his opinion $2,613,000. This was $1,431,000 lower than the assessment of the real estate. The appraiser's final opinion of the value of the personal property was $12,200,000 which included $1,575,000 as the value of the inventory. In his opinion the aggregate value of the mill was thus *$14,818,000.*

### 17. Final opinion of value by plaintiff's appraiser

Plaintiff's appraiser testified that in his opinion the land had a value of $200,000 and that the buildings and structures had a value of $1,230,000.

In his opinion the machinery and equipment had a value of $5,765,000. In his opinion the aggregate value of the mill was, thus, $7,195,000. It did not include the value of the inventories. When inventories are added his valuation is increased to *$8,294,579.*

### G. CONCLUSIONS WITH RESPECT TO VALUE AND ASSESSMENTS

### 1. Presumption of correct assessment

This case is basically an action to review an administrative decision. As such, the determination made by the taxing authorities comes before the court with some presumption of correctness. The court should make every effort to sustain the action of the

taxing authorities if that is possible, under law and assessing principles which are to be applied to the facts.

Despite the complete good faith and intentions of the tax assessor, the manner in which he arrived at the assessment was not totally compatible with good assessing practices as required by the statutes and opinions of the Supreme Court in Shuler v. Walter, supra, and subsequent cases.

The evidence in this case clearly establishes that prior to reassessment in 1964 the value of plaintiff's mill and one or two other complex industries were established by negotiation and agreement. There was no need to expose the county and its taxpayers to the expense of specific appraisals.

With the advent of full cash value or fair market value assessments the necessity for formal appraisals on established principles of properties in the ten million dollar class becomes immediately apparent.

This is not to say that an assessor is compelled to obtain a formal appraisal of such properties but in this connection the language in Friedman (page 761) seems appropriate —

> In many modern industrial plants, the structure and machinery and equipment are an integral part of each other, neither having any appreciable value if separated. The appraisal of such properties requires an industrial expert, and seldom is the tax assessor or any member of his staff qualified to make such an appraisal.

It is to say that when litigation between a taxpayer and his government ensues the assessment must withstand the attack and meet the test of a proper valuation under law and appraising (assessing) principles. To the extent that it doesn't the assessment is stripped of any presumption. With this in mind we will proceed to a discussion of the various elements of property that constitute this assessment.

## 2. *Value of land*

Land cost was $74,609. Plaintiff's appraiser valued it at $200,000. Defendants' appraiser valued it at $130,000. The assessor did not value the land separately from the building and structures. Both appraisers indicated that the land should have a separate value. The court agrees and finds that the most persuasive evidence as to the value of the land was that given by Mr. Register. It should have the highest value.

Fair market value of land .......... ............................... ............ **$200,000.**

### 3. *Value of buildings and structures*

(a) Plaintiff's records indicate a value of $1,370,821.

(b) Plaintiff's appraiser, Mr. Register, testified to a value of $1,230,000.

(c) The assessment was $4,044,000 including the separate element of land.

(d) Defendants' appraiser, Mr. Howze, testified to a value of $2,483,000.

The presumption of correctness as to the assessment does not meet the test of proper appraising and assessing techniques. The assessor made no real or substantial effort to justify or support his figure. At most he relied on his "judgment" and the expertise of his own appraiser, Mr. Howze. The most the court can do under those circumstances is to adopt the opinion of Mr. Howze.

Fair market value of building and structures ............... **$2,483,000.**

### 4. *Value of personal property*

This is composed basically of the plant equipment and machinery and necessarily includes inventory.

(a) Plaintiff's records indicate a book value of $5,165.532.

(b) Plaintiff's appraiser, Mr. Register, testified to a value of $5,765,000. This did not include the inventory which is, without dispute, $1,099,000. Adding this, Mr. Register's estimate of value would be increased to $6,864,000.

(c) The total personal property assessment was $7,133,600.

(d) Defendants' appraiser, Mr. Howze, testified to a total value of $12,200,000.

It would therefore appear that the actual variation between the assessment of $7,133,600 and Mr. Register's appraisal of $6,864,000 is not sufficient to justify the court declaring the assessment of personal property invalid. On this issue therefore the plaintiff has failed to sustain its burden of proof and the assessment is determined to be within the range of allowable discretion available to tax assessors.

The court accepts the assessment figure as the fair market value of the personal property. Having followed the assessment determined by the assessor there seems to be no need to elaborate on why the court did not accept the testimony of Mr. Howze. In short, it is because the weight and credibility thereof was

thoroughly weakened, if not destroyed, by his failure to properly consider obsolescence as a factor in determining depreciation. As indicated above it is a proper factor, and apparently the assessor gave this element proper consideration because his assessment of the plant equipment and machinery is only slightly more than that of Mr. Register.

Fair market value of personal property ...................... **$7,133,600.**

## 5. *Recapitulation of values*

The court finds and determines that the fair market value of the elements specified is as follows —

| | | |
|---|---|---|
| (a) | Land | $ 200,000 |
| (b) | Buildings & structures | $2,483,000 |
| (c) | Personal property | $7,133,600 |
| | Total value | $9,816,600 |

### H.  FUTURE ASSESSMENTS

The net effect of this judgment is to confirm the determination and assessment of the assessor except where he is not supported by his own expert. That is on the value of the buildings and structural improvements.

The valuation of complex industrial property such as plaintiff's mill is highly complicated. As Friedman points out, very few tax assessors or their staffs are competent to perform the task. Consequently, the assessor of Nassau County should not be subject to criticism for the manner in which he made the assessments involved in this case.

To the contrary, he is to be, and is, highly complimented for two reasons. First, he undertook to do a complete county-wide reassessment voluntarily and at the lowest possible cost. Secondly, he recognized in his testimony the necessity for formal fee appraisals for such highly complex industrial properties.

Some states, relying on the federal government's engineering studies, have enacted statutes providing that industrial property is to be valued for ad valorem tax purposes at its book value determined in accordance with generally accepted accounting principles. Such an approach would be fairly accurate; it would simplify the task of tax assessors and taxpayers alike; and it would reduce the need for expensive appraisals to determine value. It would have many advantages, but whether it is adopted

or not is for consideration by the legislature. It is not the right of this court.

The court has no jurisdiction to direct the future conduct of the parties but it can make recommendations. In the future there will be little need to make changes in the assessed value unless substantial changes occur in the mill — e.g. new additions or increased depreciation. If substantial changes take place, which either increase or decrease the value of the property involved, plaintiff will be the first to know. It should make full disclosure to the assessor of whatever information is required to evaluate the changes and the assessor and the plaintiff may then employ capable experts who can collaborate and seek agreement upon the net effect of the changes on the value of the mill as a whole. If the two appraisers cannot agree, perhaps a third disinterested appraiser could be called in to resolve the dispute. Such a procedure would be expensive but it is cheaper than litigation and it is certainly worthwhile when the property involved represents some 15% of the entire tax roll.

It is therefore ordered, adjudged and decreed that —

(1) The fair market value of the plaintiff's real property as of January 1, 1965 for ad valorem tax assessment purposes is $2,683,000.

(2) The 1965 Nassau County ad valorem real property tax assessment amounting to $4,044,000 is grossly in excess of the fair market value of that property and, to the extent that it exceeds $2,683,000, it should be set aside.

(3) The fair market value as of January 1, 1965 for plaintiff's personal property involved in this suit is $7,133,600 and the 1965 assessment of the plaintiff's personal property is not unlawful.

(4) There is due and owing by plaintiff to the tax collector an amount equal to the tax on the valuations set forth above (at the millage set by the county commission) less the amount already paid by the plaintiff, plus interest on the differences at the rate of 6% per annum from April 1, 1966 to the date of payment.

(5) Plaintiff shall have 30 days to make the payments required by this decree.

(6) As the taxpayer has received some of the relief demanded, each of the parties to this litigation should sustain their respective costs. Therefore, costs are not assessed against either party.